Christopher A. Sproul (Bar No. 126398)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email:  csproul@enviroadvocates.com

Patricia Weisselberg (Bar No. 253015)
Law Office of Patricia Weisselberg
115 Oakdale Avenue
Mill Valley, CA 94941
Telephone: (415) 388-2303
Email: pweisselberg@wans.net

Attorneys for Plaintiff
FRIENDS OF THE RIVER

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF THE RIVER, a non-profit corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>NATIONAL MARINE FISHERIES SERVICE, *et al.*,<br><br>    Defendants. | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>**(Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*.; Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*)** |

## INTRODUCTION

1.  Plaintiff Friends of the River brings this lawsuit under the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and the Administrative Procedure Act (APA"), 5 U.S.C. §§ 702 and 706. ESA section 7(a)(2) requires that each Federal agency consult with the appropriate wildlife service if a "discretionary" "action" authorized, funded, or carried out by the agency may affect a species listed as endangered or threatened under the ESA. The wildlife service must analyze the agency's action to determine if it is likely to adversely affect ESA listed species, and if it is,

the wildlife service must provide its biological opinion as to whether the action will jeopardize the species' survival or recovery or adversely modify their critical habitat.

2.      In Claim 1, Plaintiff seeks relief from conduct by Defendants United States Army Corps of Engineers, and Lt. General Todd T. Semonite, Commanding General, U.S. Army Corps of Engineers ("collectively the "Corps") that is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA. Specifically, Plaintiff challenges the Corps's October 2013 Biological Assessment for the U.S. Army Corps of Engineers' Ongoing Operation and Maintenance of Englebright Dam and Reservoir on the Yuba River ("Englebright BA"). Plaintiff alleges that the Englebright BA improperly defines, impermissibly narrows, impermissibly segments, and inadequately analyzes the Corps's action on the Yuba River that is subject to ESA section 7 consultation ("Action").

3.      In Claim 2, Plaintiff seeks relief from conduct by Defendants National Marine Fisheries Service and Secretary of Commerce Penny Pritzker (collectively "NMFS") that is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA. Plaintiff challenges NMFS's concurrence ("Englebright concurrence") with the Englebright BA's narrow definition of the Action. Plaintiff also challenges the Englebright concurrence's conclusion that the Corps's operation and maintenance of Englebright Dam and Reservoir ("Englebright") is not likely to adversely affect three species of fish in the Yuba River listed as threatened under the ESA (the "Listed Species") and that formal ESA section 7 consultation concerning Englebright is not required.

4.      In Claim 3, Plaintiff challenges NMFS's May 12, 2014 Biological Opinion for the Corps' Operation and Maintenance of Daguerre Point Dam and Fish Ladders ("Daguerre BiOp"). Plaintiff alleges that the Daguerre BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA because it improperly defines, impermissibly narrows, impermissibly segments, and inadequately analyzes the Action. The Daguerre BiOp is also arbitrary, capricious, and an abuse of discretion because it fails to adequately analyze the "effects of the action" on the Listed Species and

their critical habitat in violation of ESA section 7(b)(2) and 50 C.F.R. § 402.14(g) and fails to properly identify the "action area" in violation of 50 C.F.R. § 402.02.

5.      In Claim 4, Plaintiff challenges NMFS's arbitrary and capricious recission of the legally valid February 29, 2012 Biological Opinion for the U.S. Army Corps of Engineers Operation and Maintenance of Englebright and Daguerre Point Dams and Englebright Reservoir on the Yuba River (File number 151422SWR2006SA00071) ("2012 BiOp") and its replacement with the legally inadequate Daguerre BiOp and Englebright concurrence.

6.      In Claim 5, Plaintiff seeks relief from the Corps's violation of its ESA section 7(a)(2) procedural duty to adequately consult with NMFS about the entire Corps Action. Instead of consulting about its entire Yuba River Action, the Corps impermissibly narrowed the definition of its Action and limited the scope of the consultation. The Corps's definition of its Action and its decision not to consult with NMFS about all of the Corps activities on the Yuba River is based on the Corps's erroneous contention that it has no discretion over the maintenance and continued existence of Daguerre Point Dam ("Daguerre") and Englebright and no authority or discretion to take any actions at the dams to benefit the Listed Species.

7.      In Claim 6, Plaintiff seeks relief from the Corps's violation of its ESA section 7(a)(2) substantive duty to ensure that activities authorized, funded, or carried out by the Corps as part of its Action do not cause jeopardy to the Listed Species or cause destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). The Corps may not rely on the legally inadequate Englebright concurrence and Daguerre BiOp to fulfill its substantive section 7(a)(2) duty.

8.      In Claim 7, Plaintiff seeks relief from the Corps's violation of ESA section 9, 16 U.S.C. § 1538 which prohibits unauthorized "take" of the Listed Species. Daguerre and Englebright are taking the Listed Species in numerous ways as is well documented in previous biological assessments and biological opinions for the Action. The Corps is also causing take as a result of the Corps' authorization

COMPLAINT FOR DECLARATORY                    3
AND INJUNCTIVE RELIEF

of Hallwood-Cordua Irrigation District's water diversion on Corps property and the Corps' contract/licenses to Pacific Gas & Electric ("PG&E") and Yuba County Water Agency ("YCWA") which enable operation of the Narrows 1 and Narrows 2 powerhouses near Englebright.

9.      In Claim 8, Plaintiff seeks relief from the Corps's violation of ESA section 7(a)(2) and 50 C.F.R. § 402.16 by failing to reinitiate consultation with NMFS. Plaintiff alleges that reinitiation of consultation is required because the ecological surrogates in the Daguerre BiOp's incidental take statement ("ITS") have not been complied with, new information reveals that the Action may affect the Listed Species or critical habitat in a manner or extent not previously considered, and/or the Action has been modified in a manner that causes an effect to the Listed Species not considered in the Englebright concurrence and/or Daguerre BiOp.

10.      In claim 9, Plaintiff seeks relief from NMFS's failure to reinitiate ESA section consultation with the Corps concerning its Action in violation of the APA, 5 U.S.C. § 706(1), which authorizes the Court to compel agency action unlawfully withheld or unreasonably delayed. Plaintiff alleges that reinitiation of consultation is required because the ecological surrogates in the Daguerre BiOp's ITS have not been complied with, new information reveals that the Action may affect the Listed Species or critical habitat in a manner or extent not previously considered, and/or the Action has been modified in a manner that causes an effect to the Listed Species not considered in the Englebright concurrence and/or Daguerre BiOp.

## JURISDICTION

11.      This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 (civil action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel mandatory duty), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

12.      This Court has subject matter jurisdiction over violations of the ESA by the Corps pursuant to 16 U.S.C. § 1540(g)(1), which authorizes citizens to bring suit to enjoin any person that is in

violation of the ESA. Plaintiffs provided notice of intent to file suit under the ESA on January 12, 2016, more than 60 days prior to filing this litigation.

13.     This Court has subject matter jurisdiction over the APA claims set forth in this Complaint pursuant to 28 U.S.C. section 1331 (an action for declaratory, injunctive and other relief arising under the Constitution and laws of the United States) because this case involves a civil action arising under the laws of the United States, specifically 5 U.S.C. § 702, which authorizes any person aggrieved by an agency action under a relevant statute to seek judicial review, and 5 U.S.C. §§ 706(1) and 706(2), which authorizes a reviewing court to compel an agency to take an action that has been unlawfully withheld or unreasonably delayed, and to set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

14.     Plaintiff and its members are aggrieved by the Englebright BA, Englebright concurrence, Daguerre BiOp, and the Corps's and NMFS's inadequate ESA consultation concerning the numerous ongoing adverse impacts that Englebright and Daguerre are causing the Listed Species and their critical habitat. Plaintiff and its members are also aggrieved by the Corps's unauthorized take of the Listed Species. FOR and its members visit the Yuba River for wildlife viewing, scientific observation, educational study, aesthetic enjoyment, spiritual contemplation, and recreation, including rafting, kayaking, and fishing. The Corps's and NMFS's inadequate ESA Section 7 consultation concerning Englebright and Daguerre, and the Corps's unauthorized take of the Listed Species, has caused and will in the future continue to cause an impairment of the state of the ecosystem of the Yuba River and the fisheries therein, and as a result, FOR's use of the area is impaired and diminished. Failure to issue a legally adequate BiOp for Englebright and Daguerre will lead to the Corps taking a greater number of the Listed Species. As a result, FOR's members' enjoyment of the Listed Species has been and is being impaired and diminished.

15.     This Court has personal jurisdiction over the National Marine Fisheries Service, the Secretary of Commerce, the Army Corps of Engineers, the Secretary of the Army, the Army Corps's Commanding General, and the Secretary of the Interior. NMFS and the Corps are Federal agencies established by the government of the United States. The regional offices of NMFS and the Corps overseeing the Yuba River are located in the City and County of Sacramento.

## VENUE

16.     Venue in the United States District for the Eastern District of California is proper under 28 U.S.C. section 1391(e) because the property that is the subject of the action is located within the Eastern District of California. In addition, the NMFS and Corps offices overseeing the Yuba River are located in the City and County of Sacramento. Also, Friends of the River's office is located in the City and County of Sacramento.

## INTRADISTRICT ASSIGNMENT

17.     Intradistrict assignment of this matter to the Sacramento Division of the Court is appropriate pursuant to Civil Local Rule 3-120(d) in that the events or omissions which give rise to Plaintiff's claims occurred and are occurring in Nevada and Yuba Counties. In addition, the NMFS and Corps offices directly overseeing the action are located in Sacramento County. Plaintiff FOR's main office is located in Sacramento County.

## THE PARTIES

18.     Friends of the River was founded in 1973 and is incorporated under the non-profit laws of the State of California, with its principal place of business in Sacramento, California. FOR has more than 5,000 members dedicated to the protection, preservation, and restoration of California's rivers, streams, watersheds and aquatic ecosystems. FOR has been involved in the protection and management of California's rivers and estuaries for more than 30 years, with an emphasis on protecting free flowing rivers and streams, watersheds, water quality, aquatic habitat, and aquatic species. FOR is involved in

water rights issues with the goal of improving flows for spring Chinook, steelhead and green sturgeon and is also involved in the program to resolve fish passage issues associated with Daguerre Point Dam and Englebright Dam on the Yuba River. FOR's members use the Yuba River for water contact recreation, wildlife observation and study, aesthetic enjoyment, and spiritual renewal. FOR's members particularly enjoy as a recreational, educational, and/or spiritual pursuit observing the migration of anadromous fish in the Yuba River, including spring Chinook, steelhead and green sturgeon. Many of Friends of the River's members visit the Yuba River for outdoor recreation and spiritual renewal.

19.     As a result of the acts and omissions of Defendants alleged herein, Plaintiff's members have suffered and will continue to suffer injuries to their aesthetic, environmental, educational, spiritual, and economic interests in enjoying and using the Yuba River and its tributaries.

20.     Defendant National Marine Fisheries Service, part of the National Oceanic and Atmospheric Administration, a division of the Department of Commerce, is the agency of the United States Government responsible for administering and implementing the ESA for anadromous fisheries and generally is responsible for the stewardship of the nation's living marine resources and their habitat.

21.     Defendant Penny Pritzker, Secretary of Commerce, is the Secretary within the meaning of 16 U.S.C. sections 1540(g)(1)(C) and 1532(15) and is sued in her official capacity only. If ordered by the court, Ms. Pritzker has the authority and ability to remedy the harm inflicted by Defendants' actions.

22.     Defendant United States Army Corps of Engineers, a division of the Department of the Army, is the agency of the United States Government responsible for providing engineering services to the nation.

23.     Defendant Todd T. Semonite, Commanding General of the Army Corps of Engineers, is a person within the meaning of 16 U.S.C. §§ 1540(g)(1)(A) and 1532(13) and is sued in his official capacity only. If ordered by the Court, Lieutenant General Semonite has the authority and ability to remedy the harm inflicted by Defendants' actions.

24.     Defendant Sally Jewell, Secretary of the Interior, is the Secretary within the meaning of 16 U.S.C. sections 1540(g)(1)(C) and 1532(15) and is sued in her official capacity only. If ordered by the Court, Ms. Jewell has the authority and ability to remedy the harm inflicted by Defendants' actions.

## STATUTORY BACKGROUND

**ADMINISTRATIVE PROCEDURE ACT**

30.     The APA, 5 U.S.C. § 706, authorizes reviewing courts to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of a federal agency action. The Court must compel agency unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). The Court must also hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). The Court has jurisdiction over the APA claims pursuant to 5 U.S.C. § 702, which authorizes any person aggrieved by an agency action under a relevant statute to seek judicial review,

**ENDANGERED SPECIES ACT**

31.     The ESA was enacted to provide a means to conserve threatened and endangered species and to conserve the ecosystems upon which those species depend. 16 U.S.C. § 1531(b). The ESA calls for all Federal agencies to use their authority to seek to conserve threatened and endangered species. 16 U.S.C. § 1531(c). In addition, the ESA prohibits take of endangered and certain threatened[1] species listed under the ESA. 16 U.S.C. § 1538(a)(1). Take of a listed species means, *inter alia*, to harass, harm, kill, trap or capture the species. 16 U.S.C. § 1532(19). An actor can take a listed species within the meaning of the ESA by killing or injuring an individual member of the species, or by engaging in an act

---

[1] 16 U.S.C. section 1538 explicitly prohibits take of species listed as endangered; however, NMFS may extend this prohibition to species listed as threatened. NMFS is required to issue protective regulations for all species listed as threatened, and these regulations may prohibit take of threatened species. 16 U.S.C. § 1533(d). NMFS has issued regulations that prohibit take under 16 U.S.C. section 1538(a)(1) of all anadromous fish with an intact adipose fin that are listed as threatened.  50 C.F.R. § 223.203. The Listed Species are all such types of anadromous fish.

that causes significant habitat modification or degradation which kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering. 50 C.F.R. § 222.102.

32.     To accomplish these goals, the ESA requires that each Federal agency ("action agency") insure that any action authorized, funded, or carried out by such agency does not jeopardize the continued existence of a threatened or endangered species or result in the destruction or adverse modification of habitat determined to be critical for such species. 16 U.S.C. § 1536(a)(2). To assist Federal agencies in complying with their substantive duty to avoid jeopardizing listed species, ESA section 7(a)(2) establishes an interagency consultation requirement. 16 U.S.C. § 1536(a)(2).

33.     The threshold for triggering consultation under the ESA is low; the ESA requires Federal agencies to consult with the appropriate wildlife service ("service") whenever their actions "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2).

34.     Agency actions requiring consultation are "broadly defined" by regulation as "encompassing all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States" including granting of easements, rights-of-way, permits, or grants-in-aid.  50 C.F.R. §§ 402.02, 402.03.

35.     To facilitate the consultation process a Federal agency proposing an action that "may affect" a listed species must prepare a "biological assessment." 16 U.S.C. §§ 1536(a)(2), (c); 50 C.F.R. §§ 402.02, 402.12, 402.14. The agency preparing the biological assessment must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). In the biological assessment, the action agency evaluates the potential effects of the proposed action on all listed species within the action area identified by the service and determines, in the first instance, whether any listed species is likely to be affected by the proposed action. 16 U.S.C. § 1536(c); 50 C.F.R. §§ 402.02, 402,12, 402.14(d).

36.     If the proposed action is likely to adversely affect a listed species, the action agency and the service must engage in formal consultation. At the conclusion of the formal consultation process, the service provides the action agency with a biological opinion as to whether the action is likely to jeopardize any listed species. 16 U.S.C. § 1536(b)(3)(A), (4); 50 C.F.R. §§ 402.02, 402.14(g), (h).

37.     If the service finds that the action will likely jeopardize the species or adversely modify critical habitat, the service shall suggest reasonable and prudent alternatives that it believes would not result in jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A). If there are no reasonable and prudent alternatives that will avoid such jeopardy or adverse modification, the action agency cannot continue with the action unless it obtains an exemption under ESA section 7(h). 16 U.S.C. § 1536(a)(2).

38.     If the action or reasonable and prudent alternative to the action will result in take of a listed species, but the service concludes that the incidental taking of threatened or endangered species as a result of the action or alternative will not result in jeopardy of the species or adverse modification of its critical habitat, then the service may issue an Incidental Take Statement for that take. 16 U.S.C. § 1536(b)(4). The ITS shall set forth the impact of the incidental take on the species, the reasonable and prudent measures the service considers necessary or appropriate to minimize such impact, and the terms and conditions that the action agency must take to comply with the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4).

39.     As long as the action agency complies with the terms of the ITS, the prohibition against take in ESA section 9 will not apply. 16 U.S.C. § 1536(o)(2). However, if an agency does not comply with the ITS and its actions result in take of a listed species, or if its actions result in take not provided for in the ITS, the agency is in violation of ESA section 9. 16 U.S.C. §§ 1536(o)(2), 1538(a)(1).

40.      Regardless of the conclusion reached by the service in a biological opinion, the action agency has an independent duty to meet its substantive section 7 obligation to ensure that its actions do not jeopardize listed species. 16 U.S.C. § 1536(a)(2). An action agency violates its substantive section 7 duty if it relies on an inadequate, incomplete, or flawed biological opinion in carrying out an action.

41.     Both the action agency and the service have a non-discretionary duty to reinitiate ESA section 7 consultation under certain circumstances. 50 C.F.R. § 402.16. Federal  agencies must re-initiate consultation where discretionary Federal involvement or control over the action has been retained or is authorized by law and (a) the amount or extent of taking specified in the ITS is exceeded; or (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; or (c) the identified action is subsequently modified in

a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion. *Id.*

**FACTUAL BACKGROUND**

42.     California's anadromous fisheries are in grim condition. Despite the enactment of the ESA more than thirty years ago, Pacific salmon and steelhead, once present in seemingly endless numbers, are now counted in the hundreds. Habitat loss is largely responsible for the decline; of the original 6,000 miles of salmon habitat in the Central Valley, at least eighty percent has been lost. Impassable dams at low elevations have restricted access to most historical spawning and rearing habitat, and the remaining accessible habitat is degraded and inferior in quality to that lost.

43.      The Corps' activities on the Yuba River affect three species of anadromous fish listed as threatened under the ESA: Central Valley spring-run Chinook salmon (*Oncorhynchus tshawytscha*) ("spring Chinook"), Central Valley steelhead (*O. mykiss*) ("steelhead"), and the southern Distinct Population Segment of North American green sturgeon (*Acipenser medirostris*) ("green sturgeon")  and their designated critical habitat in the Yuba River.

44.     Designated critical habitat for spring Chinook, steelhead, and green sturgeon includes the lower Yuba River. Critical habitat for spring Chinook and steelhead may eventually include stretches upstream above Englebright Dam.

45.     The Yuba River flows from the Sierra Nevada through Sierra, Nevada, and Yuba counties until it meets the Feather River at Marysville, California. The Yuba River system once supported healthy runs of spring Chinook and steelhead. Even after the environmental devastation of rivers during the California gold rush, spring Chinook runs in the Central Valley as a whole were as large as 600,000 fish between the late 1880s and the 1940s, and steelhead runs reached 40,000 fish in the early 1960s. Spring Chinook salmon and steelhead inhabited all three forks of the Yuba River before the construction of Englebright, Bullards Bar and later New Bullards Bar Dams, which serve as impassable barriers to all fish. Spring Chinook once migrated at least as far upstream as Washington on the South Yuba, to the lower portions of the Middle Yuba, and as far upstream as Downieville on the North Yuba. Before the construction of Englebright, steelhead also spawned in the uppermost reaches of the Yuba and its tributaries. The lower Yuba River (below Englebright Dam, discussed below) provides

suitable, but not optimal, spawning and rearing habitat for juvenile spring Chinook salmon and for adult and juvenile Central Valley steelhead.

46.    The Corps operates and maintains two dams on the Yuba River, Daguerre Point Dam and Englebright Dam. Daguerre is located approximately 11.4 miles upstream of the confluence of the Yuba and Feather Rivers, in Yuba County, California. Englebright is twelve miles upstream of Daguerre, in Yuba and Nevada Counties. Congress authorized both dams as part of the Yuba River Debris Control Project. Daguerre was authorized in the Rivers and Harbor Act of June 13, 1902. In 1986, Congress eliminated the California Debris Commission, and transferred the Debris Commission's powers, duties, lands and other interests, including Daguerre to the Secretary of the Army. Englebright was constructed in 1941.

47.    Daguerre is an overflow concrete ogee spillway, 575 feet long and 25 feet high. Daguerre's purpose was to catch mining debris, preventing the debris from washing downstream into the Feather and Sacramento Rivers. Daguerre does not provide flood control or hydroelectric power generation. Daguerre, along with the mining debris stored behind it, was completely washed out during floods in 1963 and 1964, but Daguerre was replaced in 1965. The basin behind Daguerre, which was designed to collect debris, has completely silted in, and water and sediment now flow unimpeded over Daguerre.

48.    Crude fish ladders were added to Daguerre in 1911, but washed out in 1927-1928 and were not replaced until 1938. The fish ladders were damaged several times in floods and the present fish ladders were constructed in 1964. The fish ladders are inadequate at all flows. At low flows, they provide insufficient attraction flows for salmonids; at high flows, they are ineffective and sometimes closed altogether. Sediment and debris often clog the ladders, rendering them impassable. In addition, the ladders' design is poor compared to newer ladders being used: the ladders are narrow, water flow in the ladders is unmeasured and uncontrolled leading to less than optimum passage conditions. Delays caused when the ladders are closed or fish cannot find the ladders can result in stress, injury, depletion of precious energy reserves and/or pre-spawning mortality. In addition, the pool below Daguerre subjects the fish to the threat of human poachers. Even if the fish manage to make it up the ladders, sediment buildup on the upstream side of the ladders may prevent them from reaching the river channel.

All of the obstacles to passage can result in injuries, stress, delays in spawning, and/or affect egg viability. Alternatively, the fish may end up spawning downstream of Daguerre where reduced habitat and warmer temperatures adversely affect the chances of reproductive success.

49.     In addition to the problems Daguerre poses to adult salmon and steelhead migrating upstream to spawn, Daguerre affects juvenile salmon and steelhead migrating downstream. Daguerre can injure and disorient juveniles as they plunge over the face of the dam on their way downstream. The large pool at the base of Daguerre provides excellent habitat for predators, and the juveniles are highly vulnerable to predation after their trip over the dam into the turbulent waters below. This unnatural advantage Daguerre gives to the predators increases the level of predation, thus decreasing the numbers of juveniles making it to the ocean.

50.     The 2012 BiOp and three previous biological opinions concerning Englebright and Daguerre found that the Brophy Diversion in the vicinity of Daguerre also affects juvenile salmon and steelhead migrating downstream and included the Brophy diversion as part of the Corps action undergoing ESA Section 7 consultation . The Brophy Diversion is owned and operated by YCWA. The South Yuba Water District ("SYWD") built the Brophy Diversion in or around 1985. SYWD and Brophy Water District ("BWD") shared the cost of construction, and the diversion is used to deliver water to both of those entities. On information and belief, FOR alleges that the Corps has issued a license, easement, and/or right-of-way grant to YCWA authorizing the operation of the Brophy Diversion. Englebright is located twelve miles upstream of Daguerre. Completed in 1941, Englebright, like Daguerre, was constructed to retain hydraulic mining debris from washing downstream. Englebright is 260 feet high and stores 70,000 acre-feet of water. Englebright has no fish ladders and is therefore a complete barrier to fish passage to the upper reaches of the Yuba River. The upper reaches provide the highest quantity and quality of critical habitat to maintain self-sustaining populations for adult spawning and rearing juvenile spring Chinook and steelhead. Spawning substrates and flows in those reaches are more suitable than the main stem, and there is a greater amount of holding water for spring Chinook than in the lower Yuba below Englebright. In addition to blocking upstream passage of fish, Englebright also serves as a complete barrier to gravel or woody debris recruitment, from the upstream reaches to the

Yuba River's lower reaches that are accessible to the species, except in extreme high flow conditions when the dam fills and spills.

51.     Englebright offers very little flood control, and is not managed for flood control purposes. Following construction of New Bullards Bar Reservoir ("Bullards Bar"), the burden of flood control in the Yuba watershed shifted to the New Bullards Bar reservoir. Englebright reservoir provides the head needed for the operation of two hydroelectric facilities. The Corps issued easements to PG&E and YCWA for the construction and operation of two hydroelectric facilities, the Narrows 1 and Narrows 2 powerhouses ("the Powerhouses"). The majority of releases from Englebright is through the Powerhouses, although if the Englebright reservoir is full, water spills over the dam. The Corps retains responsibility for maintenance of the Englebright dam structure, while PG&E and YCWA administer water releases from Englebright and operation and maintenance of the Powerhouses.

**2002 Biological Opinion**

52.     On March 8, 2000, the Corps initiated consultation with NMFS under the ESA concerning the Corps' operation of Daguerre and Englebright, and the Corps' approval of operation of the Brophy Diversion. The Corps issued its biological assessment ("2000 BA") concerning these activities pursuant to ESA section 7(c) with NMFS on July 29, 2000. The Corps amended its 2000 BA about six months later to include measures intended to reduce the take of listed salmonids by alleviating some of the adverse impacts associated with the Project, and asked that the biological opinion be based upon that additional information. In particular, the Corps stated that it planned to develop and implement a plan to routinely clear debris from the two Daguerre fish ladders, that it planned to install a pressure/transducer device at Daguerre to monitor debris, that it planned to develop and implement a plan to remove sediment above Daguerre, and that it would work to improve conditions for juvenile salmonids at the Brophy Diversion. Additionally, the Corps asserted that it would attempt to ameliorate the effects of Englebright by working on a gravel injection program. The Corps also specifically stated that one of the most important measures that the Corps would take is to assume a lead role in the ongoing efforts for the restoration of salmonid populations on the Yuba River including the Upper Yuba River Studies Program and the Yuba River Technical Working Group including acting as the lead

Federal agency in conducting environmental review pursuant to the National Environmental Policy Act of improving fish passage at Daguerre.

53.     NMFS issued a biological opinion entitled "Operations of Englebright Dam/Englebright Lake and Daguerre Point Dam on the Yuba River, California" to the Corps on March 27, 2002 ("2002 BiOp"). The 2002 BiOp reached a finding of no jeopardy. NMFS specifically limited that determination to a five-year time period.

54.     In the 2002 BiOp, NMFS recognized the impacts outlined above that Daguerre, Englebright, and the Brophy Diversion have on listed spring Chinook and steelhead.

55.     In the 2002 BiOp, NMFS specified four reasonable and prudent measures that it believed necessary and appropriate to minimize take of spring Chinook and steelhead. NMFS required the Corps: (1) to seek to improve the effectiveness and reliability of the Daguerre fish ladders; (2) to implement interim as well as long term improvements to the Brophy Diversion to reduce impacts of that facility on juvenile salmonids; (3) to develop and implement a gravel injection program in key areas on the Yuba River which have been deprived of adequate spawning gravels by the interruption of recruitment of gravel by the construction and maintenance of Englebright; and (4) to provide an annual report on the progress and effectiveness of the above measures. NMFS also included terms and conditions to implement the reasonable and prudent measures. The terms and conditions required that the Corps: (1) seek to improve the effectiveness and reliability of Daguerre fish ladders, by clearing debris from the fish ladders, installing a remote pressure/transducer device to monitor the accumulation of debris in the fish ladders, and by controlling sediment on the upstream side of Daguerre where the fish ladders exit so that sediment build-up does not impede fish passage; (2) implement interim as well as long term improvements to the Brophy Diversion to reduce impacts of that facility on juvenile salmonids; and (3) develop and implement a gravel injection program in key areas on the Yuba River which have been deprived of adequate spawning gravels by the interruption of recruitment of gravel by the construction and maintenance of Englebright. The 2002 BiOp also mandated that the Corps submit annual reports on the Corps' progress in implementing the 2002 BiOp's terms and conditions.

56.     Recognizing that the Corps's Yuba River Action would take species under the ESA, NMFS also issued an incidental take statement with the 2002 BiOp. NMFS did not specify an exact

number of allowable take in this 2002 ITS. Instead, NMFS set a level of permissible take based on the Corps' compliance with the Reasonable and Prudent Measures 1-4, their implementing terms and conditions, and the effects analysis set forth within the 2002 BiOp. NMFS cautioned the Corps that any action not in compliance with those requirements could cause an exceedance in anticipated take levels, thereby triggering the need to reinitiate consultation on the Project.

57.     The Corps did not comply with the 2002 BiOp's reasonable and prudent measures or attendant terms and conditions during the lifetime of the 2002 BiOp.

58.     First, the Corps did not develop an implementation plan to clear debris from the Daguerre fish ladders. The Corps did not submit any plan to clear debris to NMFS by September 27, 2002, the Corps did not implement such a plan by March 26, 2003, and the Corps did not add the plan to the requirements of the Corps Operation and Maintenance Manual for Daguerre, as required by the 2002 BiOp. The Corps did not install a remote pressure/transducer device by October 1, 2002 as required by the 2002 BiOp. The Corps did not develop an implementation plan to routinely remove or otherwise manage sediments on the upstream side of Daguerre. The Corps did not submit any sediment implementation plan to NMFS by September 27, 2002, it did not implement such a plan by March 26, 2003, and it did not add the plan to the requirements of the Corps Operation and Maintenance Manual for Daguerre, as required by the 2002 BiOp.

59.     Second, the Corps did not implement interim or long-term improvements to the Brophy diversion to reduce impacts of that facility on juvenile salmonids.

60.     Third, the Corps did not develop or implement a gravel injection program in key areas on the Yuba River which were being deprived of adequate spawning gravels due to the presence of Englebright. The Corps did not submit any gravel injection plan to NMFS by September 27, 2002, and it did not implement such a plan by March 26, 2003, as required by the 2002 BiOp.

61.     Fourth, the annual reports on the Corps' compliance efforts submitted by the Corps did not sufficiently detail the progress that was being made towards the implementation of the above listed measures and the effectiveness of those measures, as required by the 2002 BiOp and 50 C.F.R. § 402.14(i)(3).

COMPLAINT FOR DECLARATORY                    16
AND INJUNCTIVE RELIEF

62.     Spring Chinook and steelhead populations on the Yuba River have continued to decline since NMFS issued the 2002 BiOp.

63.     After NMFS issued the 2002 BiOp, NMFS listed green sturgeon as an ESA protected threatened species and further recognized that green sturgeon are being adversely affected by Daguerre.

**April 2007 Biological Opinion**

64.     On April 27, 2007, NMFS issued another biological opinion for the "Operation of Englebright and Daguerre Point Dams on the Yuba River, California, for a 1-year Period" ("April 2007 BiOp"). The April 2007 BiOp addressed only the impacts of the Corps's Yuba River Action on spring Chinook and steelhead, and did not address the impacts on green sturgeon. Although NMFS stated that the April 2007 BiOp did not include consultation for green sturgeon, it provided no justification nor explanation for failure to conduct or complete consultation on this species. The April 2007 BiOp concluded that the Action will not jeopardize the continued existence of spring Chinook and steelhead and that the Action is not likely to destroy or adversely modify the critical habitat of those species for the one-year period of the April 2007 BiOp.

65.     In the April 2007 BiOp, NMFS generally described the Action as the continued operation of Daguerre and Englebright as well as the issuance of any licenses or easements for water diversion from the reach of the Yuba River between these dams. NMFS's description of the Action further included six "conservation and restoration measures" that NMFS stated the Corps had committed to incorporate as part of its operations: (1) to coordinate with other agencies to manage flows from New Bullards Reservoir and Englebright Lake to enhance critical habitat and water temperature in the lower Yuba River; (2) to coordinate with other agencies to develop a gravel implementation program; (3) pending funding and approval, to coordinate with YCWA to construct a temperature control device on the intake for Narrows 2 powerhouse; (4) to continue to implement its plan of routinely clearing debris from the Daguerre fish ladders; (5) to continue to implement its plan to routinely remove the sediment that occasionally blocks the north Daguerre fish ladder exit; and (6) to coordinate with other agencies to investigate, design, and implement an economical plan to improve conditions for juvenile spring Chinook and steelhead at the Brophy Diversion.

66.     In the April 2007 BiOp, NMFS referred to and incorporated the Effects of the Actions section in the 2002 BiOp, wherein NMFS recognized the impacts of the Action, as outlined above, on listed spring Chinook and steelhead. The April 2007 BiOp also listed several changes to the effects of the Action, including measures that NMFS asserted have occurred as well as projects that have not yet been implemented.

67.     In the April 2007 BiOp, NMFS stated that the overall status of spring Chinook and steelhead essentially remained the same as in the 2002 BiOp. NMFS observed that spring Chinook still faced a moderate to high risk of extinction and that steelhead populations have experienced substantial decline. NMFS stated that in the Yuba River, spring Chinook escapement is relatively low and greatly reduced from historic levels. NMFS asserted that it had very little information about population trends and overall abundance of steelhead in the Yuba River.

68.     The April 2007 BiOp included an Incidental Take Statement ("April 2007 ITS") for the Action. The April 2007 ITS set three ecological surrogates as a measure of allowable take for the one-year period of the April 2007 BiOp, which included flow releases from Englebright, the availability of spawning gravel below Englebright, and the maintenance of clear passage through the ladders on Daguerre. The April 2007 ITS did not set any quantitative measure of these requirements, stating that the analysis of effects anticipates that the operation of a full-flow bypass around the Powerhouses will prevent large flow fluctuations in the lower Yuba River, that a gravel injection program will be implemented in 2007, which will inject at least 500 tons of gravel, and finally that the fish ladders' exits will be kept clear of sediment and that a clear channel will be maintained from ladder exits to the main channel of the river. The April 2007 ITS stated that if these ecological surrogates are not met, then the Action will be considered to have exceeded anticipated take levels, triggering the need to reinitiate consultation.

69.     The April 2007 ITS also included one reasonable and prudent measure to minimize take of spring Chinook and steelhead, which required the Corps to implement the proposed pilot gravel injection program within one year of the issuance of the April 2007 BiOp.

70.     The Corps did not comply with the April 2007 BiOp's one reasonable and prudent measure during the April 2007 BiOp's term, as the Corps did not add any gravel to the Yuba River

below Englebright during the term of the April 2007 BiOp. The Corps also did not implement the conservation and restoration measures specified in the April 2007 BiOp. Finally, the ecological surrogates specified in the April 2007 BiOp were not met.

**November 2007 Biological Opinion**

71.     On November 21, 2007, NMFS issued another biological opinion for the Action ("the November 2007 BiOp"). Unlike its prior two biological opinions for the Action, NMFS did not set an expiration date for the November 2007 BiOp and the November 2007 BiOp ostensibly permanently addressed the impacts of the Action on spring Chinook, steelhead, and green sturgeon. The November 2007 BiOp concluded that the Action will not jeopardize the continued existence of spring Chinook, steelhead and green sturgeon and that the Action is not likely to destroy or adversely modify the critical habitat of the Species.

72.     In the November 2007 BiOp, NMFS indicated that it was incorporating sections of the 2002 BiOp by reference. For example, NMFS indicated it was incorporating by reference the 2002 BiOp's description of baseline habitat conditions for spring Chinook and steelhead in the Yuba River.

73.     In the November 2007 BiOp, NMFS again generally described the Action as the continued operation and maintenance of Daguerre and Englebright as well as the issuance of any licenses or easements for water diversions for all reaches of the Yuba River affected by Englebright and Daguerre. The November 2007 BiOp further indicated that the Corps's description of the Action included five "conservation and restoration measures" that NMFS stated the Corps had committed to incorporate as part of its operations:  (1) to coordinate with other agencies to manage flows from New Bullards Reservoir and Englebright Lake to enhance critical habitat and water temperature in the lower Yuba; (2) to coordinate with other agencies to develop and implement a gravel implementation program; (3) to continue to implement its plan of routinely clearing debris from the Daguerre fish ladders; (4) to continue to implement its plan to routinely remove the sediment that occasionally blocks the Daguerre fish ladders' exits; and (5) to coordinate with other agencies to investigate, design, and implement an economical plan to improve conditions for juvenile spring Chinook and steelhead at the Brophy Diversion. These five "conservation and restoration measures" were identical to five of the six "conservation and restoration measures" for the Action that NMFS identified in the April 2007 BiOp.

1   NMFS, however, deleted from the November 2007 BiOp's list of "conservation and restoration

2   measures" one of the "conservation and restoration measures" that NMFS had listed in the April 2007

3   BiOp: that pending funding and approval, the Corps would coordinate with YCWA to construct a

4   temperature control device on the intake for Narrows 2 powerhouse. NMFS provided no explanation

5   why it and the Corps had deleted this conservation and restoration measure from the list of

6   environmentally beneficial measures that the Corps had committed to implement to reduce the impact of

7   the Action on spring Chinook and steelhead.

8       74.     The November 2007 BiOp confirmed that the Action has caused and continues to cause

9   several different adverse impacts on spring Chinook, steelhead and green sturgeon.

10      75.     In the November 2007 BiOp, NMFS stated that the overall status of spring Chinook and

11  steelhead essentially remains the same as in the 2002 BiOp. NMFS observed that the spring Chinook

12  still faces a moderate to high risk of extinction and that steelhead populations have experienced

13  substantial decline. NMFS stated that in the Yuba River, spring Chinook escapement is relatively low

14  and greatly reduced from historic levels. NMFS asserted that it has very little information about recent

15  population trends and overall abundance of steelhead in the Yuba River, other than that steelhead have

16  not substantially recovered and continue to be at risk of extinction.

17      76.     The November 2007 BiOp indicated that green sturgeon's survival is jeopardized by

18  severe losses of its traditional spawning habitat, which is now limited to a portion of the Sacramento

19  River due to various artificial barriers on the rivers they once utilized for spawning, by reductions of

20  flows in the rivers it utilizes or once utilized for spawning due to water diversions, invasion of non-

21  native species into its habitat, and accumulation of toxic pollutants in its habitat. The November 2007

22  BiOp confirmed that green sturgeon have been found in the lower Yuba River below Daguerre, but that

23  Daguerre is a complete barrier to their passage above Daguerre.

24      77.     The November 2007 BiOp included an Incidental Take Statement ("November 2007

25  ITS") for the Action. The November 2007 ITS again set three ecological surrogates as a measure of

26  allowable take of spring Chinook, steelhead, and green sturgeon: flow releases from Englebright, the

27  availability of spawning gravel below Englebright, and the maintenance of clear passage through the

28  ladders on Daguerre. The November 2007 ITS did not set any quantitative measure of these

COMPLAINT FOR DECLARATORY                           20
AND INJUNCTIVE RELIEF

requirements, stating that NMFS's analysis of effects of the Action anticipates that the operation of a full-flow bypass on the Powerhouses associated with Englebright will prevent large flow fluctuations in the lower Yuba River, that the Corps will implement a gravel injection program in 2007, which will inject at least 500 tons of gravel, and finally that the Corps will keep the Daguerre fish ladders' exits clear of sediment and that a clear channel will be maintained from ladder exits to the main channel of the Yuba River. The November 2007 ITS stated that if these ecological surrogates are not met, then the Action will be considered to have exceeded anticipated take levels, triggering the need to reinitiate consultation.

78.    The November 2007 ITS also included five reasonable and prudent measures to minimize take of spring Chinook and steelhead and five terms and conditions implementing these five reasonable and prudent measures. The five terms and conditions were: (1), utilizing the information from its pilot gravel injection project, the Corps must develop and implement a long-term gravel augmentation program within three years for adding gravel to the Yuba River below Englebright, (2), the Corps must complete a study to determine an effective method for replenishing into the Yuba River the supply of large woody material that is trapped by Englebright and upstream reservoirs and then develop and commence implementing a long-term program to replenish woody debris in the River within 4 years, (3),  the Corps must complete a study of implementing a feasible Daguerre fish passage improvement project within 5 years and then commence implementation of the Corps' preferred alternative for securing anadromous fish passage past Daguerre within ten years,  (4), the Corps must continue to implement its Daguerre fish ladder clearing and maintenance programs and (5), the Corps must diligently pursue "the ongoing effort" for securing an improved fish screen at the Brophy diversion that meets all DFG and NMFS criteria.

79.    South Yuba River Citizens League ("SYRCL") and Friends of the River challenged the November 2007 BiOp in *South Yuba River Citizens League v. NMFS*, E.D. Cal. Case No. 2:06-cv-02845-LKK-JFM. On July 8, 2010, the United States District Court for the Eastern District of California issued an order which concluded that the November 2007 BiOp was arbitrary and capricious due to failure to properly analyze key information concerning the Listed Species, impacts of the Action on the Listed Species, and environmental baseline context for the impact of the Action on the Listed Species.

*South Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247 (E. D. Cal. 2010). The Court ordered that the November 2007 BiOp be remanded to NMFS and subsequently ordered that NMFS prepare a new biological opinion for the Action by February 29, 2012, consistent with the Court's July 8, 2010 order.

**2012 Biological Opinion**

82.     Following the court remand of the 2007 BiOp, the Corps prepared a new "Biological Assessment for the U.S. Army Corps of Engineers Ongoing Operation and Maintenance of Englebright Dam and Reservoir, and Daguerre Point Dam on the Lower Yuba River" and submitted it to NMFS in January 2012 ("2012 BA"). The 2012 BA deviated from the approach the Corps had taken in its previous biological assessments for the Action. The Corps separated the impacts of the Action on the Listed Species stemming from the "continued presence" of Englebright and Daguerre from the impacts caused by the Corps' "operations and maintenance" of Englebright and Daguerre. The Corps only considered impacts caused by what the Corps defined to be its "operations and maintenance" activities to be impacts of the agency action under consultation. The Corps designated impacts caused by the "continued presence" of the dams to be part of the environmental baseline and not part of the Action under consultation. Using this approach, the 2012 BA concluded that the impacts caused by the Action were limited and did not jeopardize the continued existence of the Listed Species.

83.     NMFS issued a new biological opinion on February 29, 2012. The 2012 BiOp rejected the 2012 BA's definition of the Action. Consistent with all past biological opinions and biological assessments, the 2012 BiOp described the Action, *i.e.*, the "agency action" subject to ESA consultation, as the Corps' continued operation and maintenance of Englebright and Daguerre. The 2012 BiOp states that these operation and maintenance activities include perpetuating the dams' existence as well as the issuance and administration of new and existing permits, licenses, and easements to: (1) non-federal entities for their operations of water diversion and power generation facilities at the dams; (2) federal, state, and local agencies, commercial interests, and private individuals for maintaining public utilities and right-of-way purposes on some Corps lands around Englebright Reservoir; and (3) non-federal entities holding use and occupation easements for properties in the Yuba Goldfields.

84.     The 2012 BiOp stated that the overall status of Yuba River spring Chinook and steelhead has worsened since the last status review, while the status of green sturgeon has been compromised by low abundance, limited distribution, and lack of population redundancy. NMFS underscored the severe impacts being caused by the Action. For instance, with respect to spring Chinook, the BiOp noted:

> The Yuba River population of spring-run Chinook salmon is not likely to survive the conditions perpetuated by the proposed action. . . . Project effects continue the pattern of low abundance, variable/declining growth rate, insufficient spawning substrate, spatial structure overlaps with fall-run Chinook salmon, hatchery introgression, and lack of habitat diversity. The population may not survive climate change or even variable water years, so even minor adverse effects could cause the population to go extinct.

85.     The 2012 BiOp provided similarly dire statements of the impacts of the Project on steelhead and green sturgeon. The BiOp included an Incidental Take Statement that described the expected effects of the continued operation of the Project:

> The expected effects of the proposed action in the Yuba River will result in potential death, injury, or harm to the freshwater life stages of spring-run Chinook salmon, Central Valley steelhead, and/or the Southern DPS of North American green sturgeon in the Yuba and occasionally the lower Feather River downstream from the confluence with the Yuba River. These effects are the result of continued operation of the proposed action. Anticipated effects of the proposed action are expected to include: (1) blocked upstream migration of anadromous fish in the Yuba River at Daguerre and Englebright dams due to impaired, ineffective or lack of fish passage facilities, and the compression of spawning and rearing to reaches of the Yuba River downstream from project dams; (2) generally limited habitat availability of impaired quality (lack of LWD, in-channel riparian, and spawning substrate) for spring-run Chinook salmon, Central Valley steelhead, and Southern DPS green sturgeon on the currently accessible portion of the Yuba River; (3)

continued hybridization, through competition for limited spawning space and straying, between Central Valley spring-run Chinook salmon and fall-run Chinook salmon related to the effects described above.

86.     In light of the severely degraded status of the Listed Species and the environmental baseline, NMFS concluded that these numerous severe Project impacts are likely to cause jeopardy to the survival and recovery of the Listed Species, and destroy or adversely modify their designated critical habitat. To avoid this jeopardy and adverse modification of critical habitat, NMFS recommended the implementation of a Reasonable and Prudent Alternative ("RPA") to the proposed Project. The RPA included near-term and long-term actions relating to fish passage at Englebright and Daguerre and programs to augment gravel, restore the river channel, control predators, and monitor salmonids and green sturgeon, among other things.

**2012 Meetings Leading to Reinitiation of Consultation**

87.     Immediately after NMFS issued the 2012 BiOp, the Corps announced that it would not comply with many of the RPA actions that the BiOp deemed necessary to avoid jeopardy to the Listed Species. Eventually the Corps did "conditionally accept" the 2012 BiOp. However, the Corps continued to assert in a series of meetings with NMFS that the scope of the "agency action" undergoing consultation did not include the Corps' perpetuation of Englebright and Daguerre's existence. The Corps continued not to comply with many of the RPA actions specified in the 2012 BiOp.

88.     On November 27, 2012 NMFS extended several of the deadlines for the RPA actions because the Corps had failed to meet them, or expected not to meet them. On February 26, 2013, the Corps submitted a request for reinitiation of consultation along with a list of six mitigation measures it proposed to implement in place of the RPA during the pendency of the consultation.

89.     On May 3, 2015, SYRCL and FOR filed a motion for summary judgment in litigation pending in the Eastern District of California claiming the Corps' failure to carry out the 2012 BiOp's RPA actions or other measures to avoid jeopardizing the Listed Species violated the ESA. On June 27, 2013, YCWA moved for summary judgment in a related case also pending in the Eastern District of California claiming the 2012 BiOp, and the Corps conditional acceptance of it, violated the ESA and the

APA. NMFS and the Corps requested that the Court stay all litigation while NMFS prepared a new biological opinion. On August 13, 2013, the Court stayed the case, ordered the Corps to complete a new biological assessment by October 22, 2013 and ordered NMFS to complete a new biological opinion by May 12, 2014. The Court also mandated that the Corps carry out the six mitigation measures it had proposed to implement during the consultation.

**October 2013 Biological Assessments for Daguerre and Englebright**

90.    On October 22, 2013, the Corps submitted not just one biological assessment concerning the Action as it had in past years, but two: the Englebright BA and the Biological Assessment for the U.S. Army Corps of Engineers Authorized Operations and Maintenance of Existing Fish Passage Facilities at Daguerre Point Dam (Oct. 2013) ("Daguerre BA") (collectively, "the 2013 BAs").

91.    The 2013 BAs discard the 2000 and 2007 BAs' description of the Action, as well as the 2002, 2007, and 2012 BiOps' description. Instead the 2013 BAs create a new description of the Action based on what the Corps asserts are its discretionary and non-discretionary activities on the Yuba River and what are "future" actions requiring a separate ESA consultation. The 2013 BAs define the Corps' maintenance of the existence of Englebright and Daguerre as a non-discretionary activity and therefore not agency action subject to ESA section 7 consultation. The 2013 BAs consider the dams' ongoing adverse impacts on the Listed Species part of the environmental baseline and not effects of the action subject to consultation. Further, the Daguerre BA asserts that formal ESA section 7 consultation concerning Daguerre is narrowly limited to operation and maintenance activities affecting the Daguerre fish ladders.

92.    The 2013 BAs, also for the first time, define issuance and administration of a license for the Brophy Diversion as a future action requiring a separate consultation. The Corps issued a license for operation and maintenance of the Brophy Diversion to the South Yuba Water District in 1985. The license expired in 2000 and the Corps has continued it indefinitely under the existing terms. The 2000 and 2007 BAs, and the 2002, 2007, and 2012 BiOps all considered the Corps' issuance and administration of the existing Corps license for the Brophy Diversion to be part of the Action undergoing consultation.

93.     The Corps' issuance of a contract to YCWA for operation and maintenance of the Narrows 2 powerhouse and a license to PG&E for the Narrows 1 powerhouse near Englebright are also identified in the 2013 BAs as future actions requiring separate ESA consultations. This deviates from the 2000 and 2007 BAs, and the 2002, 2007, and 2012 BiOps which all considered the Corps' issuance and administration of these contract/licenses to be part of the Action undergoing consultation.

**2014 BiOp for Daguerre and Concurrence for Englebright**

94.     On May 12, 2014, NMFS rescinded the 2012 BiOp and issued its most recent biological opinion for the Action, the Daguerre BiOp. The Daguerre BiOp is limited in scope and only covers the Corps's operation of the Daguerre fish ladders (flow gates, baffle boards, debris removal), sediment management, flashboard management, a river stage gage, a contract for operation of the fish counting system in the fish ladders, and a contract for the installation of flashboards on the dam. Unlike the 2012 BiOp, which concluded that the Action is likely to jeopardize the Listed Species' continued existence and adversely modify their critical habitat, the Daguerre BiOp concluded that the Action narrowly described in the BiOp is not likely to jeopardize the Listed Species.

95.     Also, on May 12, 2014, NMFS issued a letter concurring with the Englebright BA's narrow definition of the Action and concurring that the Action, as defined in the Englebright BA, may affect, but is not likely to adversely affect the Listed Species. Because of NMFS's concurrence the Corps and NMFS did not engage in formal ESA section 7 consultation concerning Englebright's effects on the Listed Species and NMFS did not issue a biological opinion for Englebright. Accordingly, there no longer is a NMFS biological opinion in effect for Englebright.

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Against the Corps**

**Request for Declaratory Relief and Injunction to Set Aside the Englebright BA**

96.     Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

97.     The Englebright BA is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA because it improperly defines, impermissibly narrows and segments, and inadequately

analyzes the Corps's Action on the Yuba River. Specifically, the Englebright BA erroneously concludes that: 1) the Corps' maintenance of the ongoing existence of 260-feet tall Englebright Dam as it was constructed in 1941 with no fish passage is non-discretionary; 2) the Corps' maintenance of the ongoing existence of 260-feet tall Englebright as it was constructed in 1941 with no fish passage is not an action subject to ESA consultation; 3) the numerous ongoing adverse effects that Englebright's existence causes the Listed Species and their critical habitat in the Yuba River are not effects of the Action; and 4) the Corps's issuance and ongoing administration of permits, licenses and easements to YCWA for operation of the Brophy Diversion; contracts to YCWA for the use of Englebright for the generation of power at the Narrows 2 powerhouse; and the license to PG&E for the Narrows 1 powerhouse (collectively the "Corps Licenses") are future actions requiring separate ESA consultations.

98.    The Englebright BA's conclusion that the Corps's operation and maintenance of Englebright is not likely to adversely affect the Listed Species or their critical habitat and that formal ESA consultation about Englebright is not required is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA.

99.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(1) and 706(2)
### For Failure to Comply with ESA
### Against NMFS

### Request for Declaratory Relief and Injunction to Set Aside the Englebright Concurrence

100.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

101.    NMFS's concurrence with the Englebright BA's narrow definition of the Corps's Action on the Yuba River is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA. Specifically, NMFS unlawfully concurs with the Englebright BA's conclusion that: 1) the Corps's maintenance of the ongoing existence of 260-feet tall Englebright Dam with no fish passage is not an action subject to ESA consultation; 2) the ongoing adverse effects that Englebright causes the Listed

Species and their critical habitat in the Yuba River are not effects of the Corps's Action; and 3) the Corps's issuance and ongoing administration of the Corps's Licenses are future actions requiring separate ESA consultations. NMFS issued the formal concurrence in a letter to Colonel Michael J. Farrell, Commander, U.S. Army Corps of Engineers, Sacramento District, on May 12, 2014 (File Number WCR-2013-3).

102.    It is NMFS's legal responsibility to correctly identify the action that is subject to consultation. However, NMFS abdicated that responsibility in the Englebright concurrence and without explanation reversed the definition of the Corps' Yuba River Action identified in the 2002, April 2007, November 2007, and 2012 biological opinions.

103.    NMFS's concurrence with the Englebright BA that the Corps's operation and maintenance of Englebright is not likely to adversely affect the Listed Species or their critical habitat and that formal ESA consultation concerning Englebright is not necessary is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA.

104.    In the alternative, NMFS has unlawfully withheld formal ESA section 7(a)(2) consultation with the Corps concerning the Corps's maintenance of the existence of Englebright and Daguerre and the Corps's issuance of, and ongoing administration of, permits and easements to YCWA and PG&E in violation of the APA, 5 U.S.C. § 706(1).

105.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth

**THIRD CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act 5 U.S.C. § 706(2)**
**For Failure to Comply with ESA**
**Against NMFS**

**Request for Declaratory Relief and Injunction to Set Aside the Daguerre BiOp**

106.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

107.    The Daguerre BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA because it does not analyze the entire Corps Action on the Yuba River. Instead, of analyzing the entire Action, the Daguerre BiOp improperly defines, and impermissibly narrows and segments the Action. It is NMFS's legal responsibility to correctly identify the action that is subject to consultation. However, NMFS has abdicated that responsibility, and without explanation has reversed

the 2002, April 2007, November 2007, and 2012 biological opinions' definition of the Action. Instead the Daguerre BiOp merely adopts the definition in the Daguerre BA which states that: 1) the Corps's Action does not include maintaining the ongoing existence of Englebright and Daguerre; 2) the Corps's maintenance and operation of Waterway 13 is not part of the Action; 3) the Corps's issuance and ongoing administration of the Corps's Licenses are future actions requiring separate ESA consultations; 4) Corps operations at Daguerre to implement the Daguerre Sediment Management Plan, Daguerre Flashboard Management Plan, and Daguerre Debris Monitoring and Maintenance Plan are ESA section 7(a)(1) "protective conservation measures" that have been incorporated into the Action; and 6) Corps operations on the Yuba River to implement the Gravel Augmentation Implementation Plan and Large Woody Material Management Plan are not part of the Action, and instead are "voluntary conservation measures" subject to funding availability.

108.    The Daguerre BiOp is also invalid because it fails to adequately analyze the effects of the Action on the Listed Species and their critical habitat in violation of ESA section 7(b)(2) and 50 C.F.R. § 402.14(g). The Daguerre BiOp does not adequately identify and analyze the effects of the Action because the BiOp does not consider as effects of the Action the numerous ongoing and future adverse impacts that the existence of Englebright and Daguerre cause the Listed Species and their critical habitat. Instead, the Daguerre BiOp improperly considers the ongoing and future impacts of the existence of Englebright and Daguerre as part of the environmental baseline. The Daguerre BiOp also provides no analysis of the effects of the Action taken together with the effects of actions that are interrelated and interdependent with the Action. The 2012 BiOp identified several interrelated and interdependent actions that may affect the Listed Species and their critical habitat. However, the Daguerre BiOp eliminates consideration of these interrelated and interdependent actions without sufficiently explaining why NMFS no longer considers them interrelated and interdependent. Instead, the Daguerre BiOp simply adopts the Daguerre BA's interpretation that there are no interrelated and interdependent actions.

109.    The Daguerre BiOp is also arbitrary, capricious, and an abuse of discretion because it does not properly identify the "action area." The action area is defined in 50 C.F.R. § 402.02 as all areas to be affected directly or indirectly by the action, and not merely the immediate area involved in the action. It is NMFS's responsibility under 50 C.F.R. § 402.02 to identify the action area. However, NMFS

abdicated this responsibility and instead simply adopted the Daguerre BA's impermissibly narrow definition of the action area which excludes much of the action area defined in the 2012 BiOp. Although the action area defined in the Daguerre BiOp differs significantly from the 2012 BiOp, NMFS offers no explanation why it changed its interpretation of the action area. Because the Daguerre BiOp does not define the Corps's Yuba River Action and the effects of the Action in a manner that complies with the ESA, the Daguerre BiOp does not adequately analyze the Action and cannot reasonably conclude that the Action is not likely to jeopardize the continued existence of the Listed Species or adversely modify their critical habitat.

110.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth herein.

## FOURTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### Against NMFS

### Request for Declaratory Relief and Injunction to Set Aside Daguerre BiOp

111.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

112.    NMFS's rescission of the valid 2012 BiOp and its replacement with the legally inadequate Daguerre BiOp is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA.

113.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth herein.

## FIFTH CLAIM FOR RELIEF
### Violation of the ESA 7(a)(2) - Duty to Consult
### 16 U.S.C. § 1536(a)(2)
### Against the Corps

### Request for Declaratory Relief and Injunction to Compel the Corps to Adequately Consult with NMFS

114.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

115.    The Corps has violated its ESA section 7(a)(2) procedural obligations by failing to adequately consult with NMFS about the impacts of the Corps's Yuba River Action on the Listed Species. Instead of consulting about its entire Action as required by the ESA, the Corps improperly narrowed the definition of its Action and impermissibly limited the scope of the consultation, as described above.

116.    The Corps's narrow definition of its Action and failure to formally consult with NMFS about Corps activities on the Yuba River that are adversely affecting the Listed Species is based on the Corps's erroneous contention that it has no discretion over the maintenance of Daguerre's and Englebright's existence with impaired or no fish passage and no authority or discretion to take any actions at the dams, nor any present duty to take actions with respect to the Corps Licenses, to benefit the Listed Species.

117.    WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CLAIM FOR RELIEF
### Violation of ESA Section 7(a)(2) - Duty to Ensure Against Jeopardy
### 16 U.S.C. §§ 1536(a)(2)
### Against the Corps

### Request for Declaratory Relief and Injunction to Compel
### the Corps to Comply with ESA

118.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

119.    The Corps has violated its ESA section 7(a)(2) substantive duty by failing to ensure that its Yuba River Action will not jeopardize the Listed Species' survival or recovery. The Corps may not rely on the Englebright concurrence and the Daguerre BiOp and its "no jeopardy" conclusion to fulfill the Corps's ESA section 7 substantive duty because the Corps's consultation with NMFS was inadequate and incomplete and the Englebright concurrence and Daguerre BiOp are legally flawed as alleged herein. The Corps knows or should know that the Englebright concurrence and Daguerre BiOp are flawed and the "no jeopardy" decision cannot not be relied upon because the Corps did not formally consult with NMFS about the numerous adverse impacts that the existence of Englebright, Daguerre and the Corps Licenses cause the Listed Species.

120.    The Corps also knows the Englebright concurrence and Daguerre BiOp cannot be relied upon to ensure the Action will not jeopardize the Listed Species because after the Englebright concurrence and Daguerre BiOp were issued new information about the Action came to light, and the Action was modified in a manner causing effects to the Listed Species that were not considered in the concurrence and Daguerre BiOp, and the Corps did not reinitiate consultation so those effects could be properly considered by NMFS.

121.    Further, the Corps has not taken any other appropriate steps to ensure that its Yuba River Action will not jeopardize the Listed Species. The Corps's failure to ensure that its Action will not jeopardize the Listed Species is a violation of the Corps's ESA Section 7(a)(2) substantive duty.

122.    WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## SEVENTH CLAIM FOR RELIEF
### Violation of ESA Section 9- Prohibition Against Unauthorized Take
### 16 U.S.C. § 1538
### Against the Corps

### Request for Declaratory Relief and Injunction
### to Enjoin the Corps From Taking The Listed Species

123.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

124.    The Corps has violated ESA section 9, 16 U.S.C. § 1538, by taking the Listed Species without authorization. As well documented in past biological assessments and biological opinions for the Action, the continued existence of Englebright and Daguerre is beyond doubt perpetuating take of the Listed Species in numerous ways by: (1) blocking access to 46.8 miles of suitable habitat for spring Chinook, 143.2 miles of suitable habitat for steelhead, and 2-6 kilometers of habitat for green sturgeon above the dams; (2) delaying spring Chinook and steelhead migration when upstream passage at Daguerre is inadequate due to debris blockages in the ladders, sediment blockages upstream, or ladder closures during high flow events—causing increased pre-spawning mortality, reproductive failure, and decreased egg viability; (3) injuring adult salmonids and green sturgeon when they attempt to ascend Daguerre's face or fish ladders; (4) causing reduction of food sources through introduction of invasive species through recreational activities; (5) forcing overlapping use of spawning areas below Englebright for spring Chinook and fall-run Chinook, resulting in hybridization, loss of spring Chinook genetic traits, and reduced viability of spring Chinook eggs; (6) Englebright's blocking the downstream movement of spawning gravels, large woody material, and upstream nutrients, limiting spawning and rearing habitat, production, food sources, cover from predators, riparian overstory, and cool water temperatures; (7) killing juvenile spring Chinook, steelhead, and green sturgeon that are consumed by predators in the plunge pool below Daguerre; (8) injuring juvenile spring Chinook and steelhead that

plunge over the rough face of Daguerre on downstream migration; and (9) degrading spawning and holding habitat for adult green sturgeon below Daguerre.

125.    These impacts constitute direct take in the form of physical injury and death of individual members of the Listed Species. In addition, these impacts constitute "harm" in the form of significant habitat modification which actually injures the Listed Species by significantly impairing essential breeding, feeding, migrating, and sheltering behaviors of the Listed Species. *See* 50 C.F.R. § 17.3.

126.    Even if the Corps were not required to include the existence of the dams as part of the agency action undergoing consultation, the Corps still has a duty to avoid causing unlawful take of a listed species under ESA section 9. The impacts caused by the passive existence of dams owned by the Corps, even if not part of an "agency action" for purposes of ESA section 7 consultation, still expose the Corps to liability under ESA section 9 for the unlawful taking being caused by the dams.

127.    The Corps is also liable for violating 16 U.S.C. § 1538(g) by causing ESA violations to be committed by third parties. The Corps' Licenses to the Hallwood-Cordua Irrigation District, to YCWA for the Narrows 2 powerhouse, and to PG&E for the Narrows 1 powerhouse authorize third parties to engage in activity which causes take of the Listed Species. The Corps is liable for the take caused by this third-party activity.

128.    On November 3, 1911, a perpetual license was issued to the Hallwood Irrigation Company for the Hallwood-Cordua diversion located on the north side of the river on Corps property. The Corps has assigned License No. DAW05-3-97-549 to this perpetual license. Take is occurring as a result of the Corps' authorization of the Hallwood-Cordua diversion on Corps property and the Corps is liable for this take. As documented in past biological assessments and biological opinions for the Action, the Hallwood-Cordua Diversion is perpetuating take of the Listed Species by: 1) impinging juvenile spring Chinook and steelhead on the diversion's fish screen;  and 2) killing juvenile spring Chinook and steelhead that are consumed by predators at the diversion's intake and outfall.

130.    Take of the Listed Species is also occurring as a result of the Corps' contract/licenses to PG&E and YCWA which enable operation of the Narrows 1 and 2 powerhouses near Englebright.

1   Powerhouse operations impair normal migration behavior when spring Chinook and steelhead attempt to

2   migrate upstream at Englebright's hydroelectric facilities.

3        131.    The Daguerre BiOp's ITS provides the Corps with only a limited amount of take

4   protection because the scope of the consultation itself was very limited. The scope of incidental take

5   protection afforded by an ITS is defined by the agency action undergoing consultation. *See* 50 C.F.R. §

6   402.14(i). Since the Corps only consulted with NMFS about what the Corps considered were its

7   discretionary actions--operating and maintaining the Daguerre fish ladders--these are the only Corps

8   Yuba River activities that have incidental take protection. The Corps is still liable for the take that

9   maintaining the ongoing existence of Englebright and Daguerre with impaired or no fish passage causes.

10  The Corps is also liable for take caused by the Hallwood-Cordua Diversion, the Narrows 2 powerhouse,

11  and the Narrows 1 powerhouse. Further, in the absence of an ITS from NMFS, the Corps has no

12  assurance that any actions it may take to attempt to minimize adverse impacts caused by the dams, the

13  Hallwood-Cordua Diversion, Narrows 1, and Narrows 2 powerhouses will be sufficient to avoid liability

14  under ESA section 9.

15       132.    WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

16                        **EIGHTH CLAIM FOR RELIEF**
17  **Violation of ESA Section 7(a)(2) and 50 C.F.R. § 402.16  - Duty to Reinitiate Consultation**
                        **Against the Corps**
18
                  **Request for Declaratory Relief and Injunction to Compel**
19                  **the Corps to Reinitiate Consultation with NMFS**

20       133.    Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

21       134.    The Corps has violated and continues to violate the ESA by failing to re-initiate

22  consultation as (1) the Action has been modified in a manner that affects the Listed Species in ways that

23  were not considered in the Englebright BA, Englebright concurrence, and Daguerre BiOp; and (2) new

24  information reveals effects of the Action that may affect the Listed Species in a manner and to an extent

25  not previously considered, and (3) the Corps retains discretionary Federal involvement and control over

26  the Action. *See* 50 C.F.R. § 402.16.

27       135.    On February 26, 2013, after a year long dispute with NMFS over the 2012 BiOp, the

28  Corps notified NMFS of its intent to reinitiate consultation with NMFS concerning the Action. The

Corps' February 26, 2013 letter stated that reinitiation of consultation was appropriate in order for the Corps to provide NMFS with additional information and clarification on subjects that include the following: 1) the scope of the Corps' authorities and discretion for purposes both of appropriately defining the proposed action and ensuring that any RPMs or RPA are within the scope of the Corps' legal authority and jurisdiction; 2) the scope of the action area and the determination of which other activities are interrelated and interdependent with the proposed action; 3)  additional information regarding the nature of the Corps' proposed activities at Englebright and Daguerre; and 4) scientific and technical information regarding the Listed Species and the effects of the proposed action on them.

136.    Reinitiation of consultation is required now because new information exists about the four topics listed above that were the trigger for reinitiation of consultation in 2013. For example, in March 2014, Congress approved and funded a Yuba River Ecosystem Restoration Reconnaissance Study. In September 2014, the Reconnaissance Study analysis was completed with recommendations for a Feasibility Study. In 2015, Congress approved and funded the Feasibility Study which is now underway. These processes have revealed new information about the Corps' authorities and discretion to take actions on the Yuba River to benefit the Listed Species. This new information may impact the definition of the Action, the action area, and the RPMs. These processes have also revealed new information about the nature of the Corps's activities at Englebright and Daguerre and new information about which other activities are interrelated or interdependent with the Action. However, although this new information triggering the duty to reinitiate consultation exists the Corps has not reinitiated consultation.

137.    Reinitiation of consultation is also required because since the Englebright concurrence and Daguerre BiOp were issued new scientific and technical information regarding the Listed Species and the Action's effects on them has emerged. For example, in April 2015, the U.S. Fish and Wildlife Service issued a Habitat Management and Restoration Plan for the Yuba River Canyon-Englebright Dam and Narrows Reaches of the Lower Yuba River that includes new scientific and technical information regarding the Listed Species and the Action's effects on them but the Corps has failed to reinitiate consultation. For another example, the Yuba Accord River Management Team has also

1  recorded record-low numbers of spring Chinook returning to spawn in the Yuba River in 2015. Despite

2  this new scientific and technical information regarding the Listed Species and the Action's effects on

3  them the Corps has failed to reinitiate consultation.

4      138.  The Daguerre BiOp uses ecological surrogates in place of limits on take of numbers of

5  fish to define the allowable amount and extent of incidental take of the Listed Species. Due to the

6  application of ecological surrogates in place of limits on take of numbers of fish, NMFS identified the

7  following reinitiation triggers. Essentially, the triggers identify requirements that, if not met, would

8  represent modifications to the action that could cause an effect to the Listed Species or critical habitat

9  that was not considered in the BiOp. These triggers include the following: 1) Sediment Removal: if the

10  sediment removal program is not implemented as described in the Daguerre BA; 2) Flashboard

11  Management: if the flashboard management program is not implemented as described in the Daguerre

12  BA; 3) Debris Maintenance and Removal: if the debris maintenance program is not implemented as

13  described in the Daguerre BA; 4) Gravel Management: if the Corps does not request annual funding for

14  the Gravel Augmentation Implementation Plan; and 5) LWM Placement: if the Corps does not request

15  annual funding for the LWM installation program. On information and belief, the Corps has not met one

16  or more of these requirements, and has therefore triggered the duty to reinitiate consultation. However,

17  the Corps has not reinitiated consultation and is in violation of 50 C.F.R. § 402.16.

18      139.  WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

19                        **NINTH CLAIM FOR RELIEF**
20              **Violation of Administrative Procedure Act, 5 U.S.C. § 706(1)**
    **Failure to Comply With ESA Section 7(a)(2), 50 C.F.R. § 402.16 - Duty to Reinitiate Consultation**
21                          **Against NMFS**

22                **Request for Declaratory Relief and Injunction to Compel**
23                **NMFS to Reinitiate Consultation with the Corps**

24      140.  Plaintiff reasserts and realleges each of the preceding paragraphs as if set forth herein.

25      141.  NMFS has violated and continues to violate the ESA by failing to re-initiate consultation

26  as (1) the Action has been modified in a manner that affects the Listed Species in ways that were not

27  considered in the Englebright BA, Englebright concurrence, and Daguerre BiOp; and (2) new

28  information reveals effects of the Action that may affect the Listed Species in a manner and to an extent

not previously considered, and (3) the Corps retains discretionary Federal involvement and control over the Action. *See* 50 C.F.R. § 402.16.

142.    On February 26, 2013, after a year long dispute between NMFS and the Corps over the 2012 BiOp, NMFS and the Corps reinitiated consultation concerning the Action. The Corps stated that reinitiation of consultation was appropriate in order for the Corps to provide NMFS with additional information and clarification on subjects that include the following: 1) the scope of the Corps' authorities and discretion for purposes both of appropriately defining the proposed action and ensuring that any RPMs or RPA are within the scope of the Corps' legal authority and jurisdiction; 2) the scope of the action area and the determination of which other activities are interrelated and interdependent with the proposed action; 3)  additional information regarding the nature of the Corps' proposed activities at Englebright and Daguerre; and 4) scientific and technical information regarding the Listed Species and the effects of the proposed action on them.

143.    Reinitiation of consultation is required now because new information exists about the four topics listed above that were the trigger for reinitiation of consultation in 2013. For example, in March 2014, Congress approved and funded a Yuba River Ecosystem Restoration Reconnaissance Study. In September 2014, the Reconnaissance Study analysis was completed with recommendations for a Feasibility Study. In 2015, Congress approved and funded the Feasibility Study which is now underway. These processes have revealed new information about the Corps' authorities and discretion to take actions on the Yuba River to benefit the Listed Species. This new information may impact the definition of the Action, the action area, and the RPMs. These processes have also revealed new information about the nature of the Corps's activities at Englebright and Daguerre and new information about which other activities are interrelated or interdependent with the Action. However, although this new information triggering the duty to reinitiate consultation exists NMFS has not reinitiated consultation with the Corps.

144.    Reinitiation of consultation is also required because since the Englebright concurrence and Daguerre BiOp were issued new scientific and technical information regarding the Listed Species and the Action's effects on them has emerged. For example, in April 2015, the U.S. Fish and Wildlife

1  Service issued a Habitat Management and Restoration Plan for the Yuba River Canyon-Englebright

2  Dam and Narrows Reaches of the Lower Yuba River that includes new scientific and technical

3  information regarding the Listed Species and the Action's effects on them but the Corps has failed to

4  reinitiate consultation. For another example, the Yuba Accord River Management Team has also

5  recorded record-low numbers of spring Chinook returning to spawn in the Yuba River in 2015. Despite

6  this new scientific and technical information regarding the Listed Species and the Action's effects on

7  them NMFS has failed to reinitiate consultation with the Corps.

8       145.    The Daguerre BiOp uses ecological surrogates in place of limits on take of numbers of

9  fish to define the allowable amount and extent of incidental take of the Listed Species. Due to the

10  application of ecological surrogates in place of limits on take of numbers of fish, NMFS identified the

11  following reinitiation triggers. Essentially, the triggers identify requirements that, if not met, would

12  represent modifications to the action that could cause an effect to the Listed Species or critical habitat

13  that was not considered in the BiOp. These triggers include the following: 1) Sediment Removal: if the

14  sediment removal program is not implemented as described in the Daguerre BA; 2) Flashboard

15  Management: if the flashboard management program is not implemented as described in the Daguerre

16  BA; 3) Debris Maintenance and Removal: if the debris maintenance program is not implemented as

17  described in the Daguerre BA; 4) Gravel Management: if the Corps does not request annual funding for

18  the Gravel Augmentation Implementation Plan; and (5) LWM Placement: if the Corps does not request

19  annual funding for the LWM installation program. On information and belief, the Corps has not met one

20  or more of these requirements, and therefore circumstances triggering the duty to reinitiate consultation

21  have occurred. However, NMFS has not reinitiated consultation with the Corps in violation of 50 C.F.R.

22  § 402.16 and the APA, 5 U.S.C. § 706(1).

23       146.    WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

24  **<u>REMEDY</u>**

25       147.    Plaintiff has no plain, speedy, and adequate remedy, in the ordinary course of law, other

26  than the relief sought in this Complaint, because there is no other mechanism for compelling

27  Defendants' compliance with the ESA and the APA as alleged herein.

28

COMPLAINT FOR DECLARATORY          38
AND INJUNCTIVE RELIEF

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

1.      A declaratory judgment, pursuant to 5 U.S.C. § 706(2), that the Englebright BA's definition of the Corps's Action and the Englebright BA's conclusion that the Action is not likely to adversely impact the Listed Species in the Yuba River is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

2.      A declaratory judgment that the Corps's operation and maintenance of the ongoing existence of Englebright and Daguerre, and the Corps' issuance and ongoing administration of the Corps Licenses are part of the Action.

3.      A declaratory judgment that the Daguerre BiOp and Englebright concurrence are arbitrary, capricious and otherwise contrary to law in violation of 5 U.S.C. § 706(2).

4.      An order pursuant to 5 U.S.C. § 706(2) vacating the Englebright concurrence and Daguerre BiOp.

5.      A declaratory judgment that NMFS's failure to reinitiate ESA section 7 consultation with the Corps is a violation of the ESA, 50 C.F.R. § 402.16, and the APA, 5 U.S.C. § 706(1).

6.      An injunction pursuant to 5 U.S.C § 706(2) ordering NMFS to withdraw its rescission of the 2012 BiOp or, in the alternative an injunction  pursuant to 5 U.S.C. § 706(1) ordering NMFS to immediately reinitiate formal ESA section 7 consultation with the Corps concerning the Corps' Action on the Yuba River.

7.      A declaratory judgment that the Corps: inadequately consulted with NMFS concerning the Corps's activities on the Yuba River in violation of the Corps's ESA section 7(a)(2) procedural and substantive duties; violated ESA section 9 by taking Listed Species in the Yuba River without authorization (including by authorizing actions via the Corps Licenses for the Hallwood-Cordua Diversion and Narrows 1 and Narrows 2 powerhouses that in turn take the Listed Species); and violated the ESA and 50 C.F.R. § 402.16 by failing to reinitiate consultation although circumstances triggering the duty to reinitiate have occurred.

8.      An injunction ordering the Corps to immediately reinitiate consultation with NMFS concerning the Action which includes perpetuating the ongoing existence of Englebright and Daguerre,

and the issuance and administration of the ongoing Corps Licenses for the Brophy Diversion, the Hallwood-Cordua Diversion and the Narrows 1 and Narrows 2 powerhouses.

     9.     An award of attorneys' fees and costs to Plaintiff.

     10.    Such other and further relief as this Court deems just and proper.

Dated:  December 2, 2016

                           Respectfully Submitted,

                           */s/ Patricia Weisselberg*
                           Patricia Weisselberg
                           Attorney for Plaintiff
                           Friends of the River