UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRIENDS OF THE RIVER,

               Plaintiff,

     v.

NATIONAL MARINE FISHERIES

SERVICE, et al.,

               Defendants.

No.  2:16-cv-00818-JAM-EFB

**ORDER DENYING PLAINTIFF'S MOTION**

**FOR SUMMARY JUDGMENT, GRANTING**

**FEDERAL DEFENDANTS' MOTION FOR**

**SUMMARY JUDGMENT, AND GRANTING**

**INTERVENOR'S MOTION FOR SUMMARY**

**JUDGMENT**

## I.   INTRODUCTION

This litigation concerns three species of threatened fish and two federally-managed dams in the Yuba River.  Friends of the River ("Plaintiff" or "FOR") sued the United States Army Corps of Engineers (the "Corps") and National Marine Fisheries Service ("NMFS") (collectively, "Federal Defendants") alleging violations of the Endangered Species Act and Administrative Procedures Act. Yuba County Water Agency ("YCWA" or "Intervenor") intervened in

the case.  ECF No. 16.  Parties filed cross-motions for summary
judgment, ECF Nos. 33, 38, 41, which were followed by opposition
and reply briefs, ECF Nos. 49, 54, 57.  For the reasons set forth
below, the Court DENIES Plaintiff's motion, GRANTS Federal
Defendants' motion, and GRANTS Intervenor's motion.

## II.    BACKGROUND

### A.    Endangered Species Act

The Endangered Species Act of 1973 (ESA) "reflects a
conscious decision by Congress to give endangered species
priority over the primary missions of federal agencies."
W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 495 (9th
Cir. 2011) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180
(1978) ("TVA v. Hill") (internal quotations marks omitted)).  The
ESA tasks federal agencies with ensuring that any "agency action"
is not likely to jeopardize the continued existence of any listed
species.  16 U.S.C. § 1536(a)(2).  Further, agency action may not
destroy or adversely modify the critical habitat of any listed
species.  Id.

Agency actions that "may affect" a listed species require
the acting agency to formally consult with the federal agency
responsible for protecting that species.  50 C.F.R. § 402.14(a);
Grand Canyon Tr. v. U.S. Bureau of Reclamation, 691 F.3d 1008,
1011–12 (9th Cir. 2012), as amended (Sept. 17, 2012).  If a
listed species is present in the area of a proposed action, the
acting agency—here, the Corps—must conduct a biological
assessment ("BA"), "for the purpose of identifying any endangered
species or threatened species which is likely to be affected by

2

1  such action." 16 U.S.C. § 1536(c).

2      At the end of the formal consultation process, the Secretary

3  of the consulting agency—here, NMFS—must issue a Biological

4  Opinion ("BiOp"). Id. § 1536(b)(3)(A). A BiOp is a "written

5  statement setting forth the Secretary's opinion, and a summary of

6  the information on which the opinion is based, detailing how the

7  agency action affects the species or its critical habitat." Id.

8  If the consulting agency believes that the project will

9  jeopardize a listed species or adversely modify the species'

10  habitat, "the Secretary shall suggest those reasonable and

11  prudent alternatives which he believes would not violate

12  subsection (a)(2) and can be taken by the Federal agency or

13  applicant in implementing the agency action." Id.

14      The ESA also prohibits any federal agency from "taking" a

15  listed species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as

16  meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap,

17  capture, or collect, or to attempt to engage in any such

18  conduct." 16 U.S.C. § 1532(19). Where a taking is incidental

19  to, rather than the purpose of, a federal action, it is referred

20  to as an incidental take. 16 U.S.C. § 1536(b)(4); 50 C.F.R.

21  § 17.3. An incidental take may be permitted if the consulting

22  agency issues the acting agency an incidental take statement

23  along with the BiOp. 50 C.F.R. § 402.14(i). If the acting

24  agency subsequently modifies the action "in a manner that causes

25  an effect to the listed species or critical habitat that was not

26  considered in the [BiOp]," or if the acting agency exceeds the

27  take authorized in the incidental take statement, the agencies

28  must reinitiate formal consultation. 50 C.F.R. § 402.16.

## B.    Administrative Procedure Act

The Administrative Procedure Act (APA) provides for judicial review of federal agencies' final actions.  5 U.S.C. § 702; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990).  "Agency decisions under ESA are governed by the [APA], which requires an agency action to be upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Defs. of Wildlife v. Zinke, 856 F.3d 1248, 1256-57 (9th Cir. 2017) (quoting Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001); 5 U.S.C. § 706(2)(A)).  A court may find that an agency's action was arbitrary and capricious,

> "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Id. at 1257 (quoting Conservation Cong. v. U.S. Forest Serv., 720 F.3d 1048, 1054 (9th Cir. 2013)).  During this deferential review, the court upholds the agency's action unless the agency failed to consider relevant factors or did not articulate "a rational connection between the facts found and the choices made."  Alaska Oil & Gas Ass'n v. Pritzker, 840 F.3d 671, 675-76 (9th Cir. 2016) (quoting Alaska Oil & Gas Ass'n v. Jewell, 815 F.3d 544, 554 (9th Cir. 2016)).

The same standard applies to both new agency policies and changes to previous agency positions.  Id. at 681.  "An agency must provide a reasoned explanation for adoption of its new policy—including an acknowledgment that it is changing its

position and if appropriate, any new factual findings that may inform that change—but it need not demonstrate that the new policy is better than its prior policy." Id. at 682.

## C. The Three Fish Species

Central Valley spring-run Chinook salmon ("spring Chinook"), Central Valley steelhead ("steelhead"), and the Southern Distinct Population Segment of North American green sturgeon ("green sturgeon") are anadromous fish. Corps R. 532:42347–42458. Born into freshwater, anadromous fish migrate to the ocean as juveniles and return to freshwater as adults to spawn and die.

Habitat blockage by dams and the degradation and destruction of habitat has decimated fish populations. Corps R. 532:42358. Current populations are a fraction of their historical abundance. Corps R. 532:42351, 42397, 42441. Due to these declines, NMFS listed the spring Chinook, steelhead, and green sturgeon (collectively, "the Listed Species") as threatened under the ESA. 64 Fed. Reg. 50,394 (Sept. 16, 1999) (spring Chinook); 71 Fed. Reg. 834 (Jan. 5, 2006) (steelhead); 71 Fed. Reg. 17,757 (April 7, 2006) (green sturgeon). The Yuba River makes up a portion of the critical habitat for each of the Listed Species. 70 Fed. Reg. 52,488 (Sept. 2, 2005) (spring Chinook, steelhead); 74 Fed. Reg. 52300 (Oct. 9, 2009) (green sturgeon). Despite their listed status, the three species continue to swim towards extinction. See Corps R. 532:42631 ("The CV spring-run Chinook salmon ESU is at moderate risk of extinction . . . [and] has worsened since the last status review."), 42634 ("The CCV steelhead DPS is at high risk of extinction . . . and the extinction risk is increasing."), 42636 ("The green sturgeon southern population DPS

is at substantial risk of extinction").

**D.    The Englebright and Daguerre Point Dams**

The Yuba River is a Northern California river that flows into the Sacramento and Feather Rivers.  <u>State of Cal. ex rel. State Land Comm'n v. Yuba Goldfields, Inc.</u>, 752 F.2d 393, 394 (9th Cir. 1985).  Extensive gold mining efforts took place in the region during the late nineteenth century.  <u>Id.</u>  One mining technique in particular had "disastrous ramifications" for the surrounding environment.  <u>Id.</u>  Hydraulic mining, by which miners spray high-pressure water along hillsides to dislodge the desired material, resulted in large deposits of debris into the Yuba River and subsequent flooding to the surrounding area.  <u>Id.</u>  In response to this problem, Congress enacted the Caminetti Act of 1893, 33 U.S.C. § 661 <u>et</u> <u>seq</u>.  <u>Id.</u>  The Caminetti Act created the California Debris Commission, "a federal agency staffed by members of the Army Corps of Engineers, which was empowered to regulate and oversee hydraulic mining in the Sacramento and Joaquin river systems within the State of California, 33 U.S.C. § 663."  <u>Id.</u>  The Caminetti Act sought to "(1) to permit hydraulic mining under conditions that would preserve and protect the navigable waters; and (2) to plan works to control the debris and restore the rivers as navigable waterways, 33 U.S.C. §§ 664, 665, 685."  <u>Id.</u>

The California Debris Commission constructed Daguerre Point Dam in 1906, diverting the river around it in 1910.  Corps R. 532:42464-65.  At only 24 feet high, the dam was originally operated to retain mining debris and serves no flood control purpose.  Corps R. 532:42322.  Daguerre Point Dam serves as a

6

partial to complete barrier in fish passage along the Yuba River. Corps R. 532:42465.  Some salmon and steelhead have been able to surmount the dam since fish ladders were constructed in the early 1920s.  Id.  Green sturgeon are unable to use the fish ladders, so Daguerre Point Dam completely blocks their upstream migration. Corps R. 532:42606.

The River and Harbors Act of 1935, Pub. L. 409, 74th Congress, approved August 30, 1935, 49 Stat. 1028, authorized construction of public works in the Sacramento River and its tributaries.  Id. at 1038.  A letter from the U.S. Army Chief of Engineers recommended constructing a reservoir at Narrows in the Yuba River to control debris.  Corps R. 163:12663.  The construction of that project, named the Englebright Dam, was completed in 1941.  Corps R. 532:42530.  Similar to the Daguerre Point Dam, the dam was not built for flood control.  Id. Releases from the Englebright Dam are made through the Narrows I and II hydroelectric power facilities.  Corps R. 532:42321.

The Fish and Wildlife Coordination Act, enacted in 1934, required consultation with the Bureau of Fisheries to prevent loss and damage to wildlife before constructing a water impoundment like Englebright Dam.  See 16 U.S.C. § 662(a).  There is no evidence that Englebright Dam complied with the Fish and Wildlife Coordination Act.  Corps R. 389:29666.  As it now stands, the 260-foot-high dam lacks fish ladders and completely blocks fish passage and access to historical spawning habitat. Corps. R 532:42526.

### E.  Procedural History

This case is one in a series of cases regarding the impact

of dams, hydropower facilities, and water diversions on Listed Species within the Yuba River. There are three prior cases within this district. See <u>S. Yuba River v. Nat'l Marine, et al.</u>, No. 2:00-cv-01410-DFL-PAN (E.D. Cal. Aug. 17, 2001) (Levi, J.) (seeking an order requiring NMFS to issue proposed and final rules pursuant to § 4(d) of the ESA for spring run chinook); <u>S. Yuba River Citizens League et al v. Nat'l Marine Fisheries Serv., et al.</u>, No. 2:06-cv-02845-LKK-JFM (E.D. Cal Aug. 26, 2014) (Karlton, J.) (challenging the propriety of a NMFS BiOp in connection with the continued operation of two Corps dams on the Yuba River); <u>S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv., et al.</u>, No. 2:13-cv-00059-MCE-EFB (E.D. Cal. Dec. 23, 2015) (England, J.) (requesting NMFS set aside extensions to 2012 BiOp deadlines).

The first consultation between the Corps and NMFS regarding Yuba River activities occurred around 2000, in response to a lawsuit brought by the South Yuba River Citizens League (SYRCL). Corps R. 356:23031. That year, the Corps requested formal consultation with NMFS in a BA regarding the impact of Englebright and Daguerre Point Dams and water diversions on spring Chinook and steelhead. Corps R. 171:12759. In 2002, NMFS issued a BiOp finding that the dams' operations were not likely to jeopardize the continued existence of the spring Chinook and steelhead or destroy or adversely modify designated critical habitat. Corps R. 356:23066. According to the 2002 BiOp, "[t]he proposed action . . . is the continuation of current Corps operations of Englebright and Daguerre Point Dams," and "[a]n important component of the Corps operations is the issuance of

permits, licenses and easements to non-federal entities for their operations of water diversion facilities at or near the dams." Corps R. 356:23033.

The Corps's 2007 BA similarly defined the agency action as the "continuation of current Corps operations associated with Englebright and Daguerre Point Dams on the Yuba River" with respect to its impact on spring Chinook, steelhead, and green sturgeon. Corps R. 178:13641–42. In the 2007 final BiOp, NMFS again determined that the agency action was not likely to jeopardize the List Species, but found a likelihood of incidental take. Corps R. 368:24749.

In 2012, the Corps prepared a BA that defined the agency's action differently. Relying on the 1998 FWS and NMFS ESA Consultation Handbook, the Corps determined that the future effects of the dams' presence should be included in the environmental baseline. Corps R. 186:14185. The Corps made this finding based on the argument that the agency did not have the authority to change the presence of these preexisting facilities. Id. at 186:14185–86. NMFS concluded in its 2012 BiOp that the Corps's proposed actions, including those the Corps believed were nondiscretionary, were likely to jeopardize the listed species. Corps R. 389:29663. NMFS also provided reasonable and prudent alternatives to avoid jeopardizing the Listed Species. Corps R. 389:29664.

The Corps had "serious concerns" regarding the 2012 BiOp and sought to reinitiate consultation based on "new information." Corps R. 544:43422. In 2013, the Corps reasserted its argument that the dams' continued existence was not an agency action

9

because it was non-discretionary. Corps R. 81:4074. The Corps also broke up what it previously considered one "agency action" along the Yuba River into multiple smaller parts, separating actions connected with the Englebright Dam, Daguerre Point Dam, and licensing. Corps R. 80:4030. The Corps postponed consultation on outgrants for the Narrows I and II and an easement for the Brophy diversion to a later date. Corps R. 81:4095-96. The 2013 Daguerre Point BA sought formal consultation, while the 2013 Englebright BA sought only informal consultation. Corps R. 81:4053.

In May 2014, NMFS changed course from its prior opinion in the 2012 BiOp. Corps R. 532, 581. In its 2014 Englebright Letter of Concurrence ("Letter of Concurrence"), the agency agreed that the Corps's proposed action at Englebright was not likely to adversely affect the Listed Species. Corps R. 581:48897. Similarly, in the 2014 Daguerre Point Dam BiOp ("2014 BiOp"), NMFS concluded that the Corps's proposed action at Daguerre Point was not likely to jeopardize the Listed Species. Corps R. 532:42637.

Plaintiff brought this suit against NMFS and the Corps, as well as the Bureau of Land Management ("BLM"), in April 2016. ECF No. 1. The parties stipulated to dismiss BLM from the case in November 2016. Order, ECF No. 24. In its Amended Complaint, Plaintiff seeks declaratory and injunctive relief. Am. Compl. at 4, ¶ 11.

Plaintiff alleges nine causes of action in its Amended Complaint: one APA claim against the Corps for issuing the 2013 Englebright BA (Count I); four APA claims against NMFS for

concurring with the Englebright BA (Count II), issuing the 2014 BiOp (Count III), rescinding the 2012 BiOp (Count IV), and failing to reinitiate consultation with the Corps (Count IX); and four ESA claims against the Corps for inadequate consultation with NMFS (Count V), jeopardizing the Listed Species (Count VI), taking the Listed Species (Count VII), and failing to reinitiate consultation with NMFS (Count VIII). Am. Compl. at 26–38, ¶¶ 96–146.

Following the submission of cross-motions on summary judgment, Plaintiff moved to strike portions of Federal Defendants' Statements of Facts. Mot. Strike II, ECF No. 56. Arguments on the summary judgment motions and the Motion to Strike were heard at oral argument on November 21, 2017. Minute Order, ECF No. 61.

### III.   STANDARD OF REVIEW

The parties have filed cross-motions for summary judgment. Summary judgment is the appropriate mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether that action is otherwise consistent with the APA standard of review. See Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769–70 (9th Cir. 1985).

Apart from the APA, the Court also grants deference to an agency's interpretation of the statutes and regulations that define the scope of its authority. Turtle Island Restoration Network v. U.S. Dep't of Commerce, No. 13-17123, 2017 WL 6598627, at *5 (9th Cir. Dec. 27, 2017) (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, 467 U.S. 837, 843 (1984)). Chevron

deference only applies where the agency rendered decisions through formal procedures.  *Id.*

In the absence of those formal procedures, other types of deference may still apply.  Under *Auer* deference, the Court "defer[s] to an agency's interpretation of its own ambiguous regulations, which controls unless 'plainly erroneous or inconsistent with the regulation,' or where there are grounds to believe that the interpretation 'does not reflect the agency's fair and considered judgment of the matter in question.'"  *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, (2012)).  *Auer* deference does not apply to an agency's interpretation of its own regulation that is inconsistent with the statute under which the agency promulgated the regulations.  *Marsh v. J. Alexander's LLC*, 869 F.3d 1108, 1117 (9th Cir. 2017).

Where an agency's construction of a statute or regulation does not qualify for either *Chevron* or *Auer* deference, the Court may still give some deference to the agency's decision. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952–53 (9th Cir. 2009) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).  Under *Skidmore* deference, the Court grants the agency's interpretation "a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."  *Marsh*, 869 F.3d at 1117 (quoting *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1036 (9th Cir. 2013)).

### IV.  OPINION

#### A.  Standing

As an initial matter, Federal Defendants have not disputed that Plaintiff, an environmental organization, has standing in this case.

The only party whose standing has been challenged is Intervenor, by Plaintiff in its Reply Brief.  FOR Reply, ECF No. 54, pp. 2-4.  Plaintiff challenged Intervenor's standing to advance the arguments made in Intervenor's Motion for Summary Judgment.  Id.  The Court addressed the issue of overlapping arguments between Federal Defendants and Intervenor in an order granting in part and denying in part Plaintiff's Motion to Strike Intervenor's Memorandum of Points and Authorities.  See Strike Order, ECF No. 48.

Earlier in this case, the Court granted Intervenor's unopposed Motion to Intervene as a matter of right.  Intervention Order, ECF No. 18.  Plaintiff did not oppose that motion.  See Mot. to Intervene, ECF No. 16, p. 1.  Accordingly, Plaintiff has waived any arguments against Intervenor's standing.

#### B.  Motion to Strike

Plaintiff filed a motion to strike the legal arguments Federal Defendants inserted into their Statements of Undisputed Facts.  See Mot. to Strike II.  For the reasons stated on the record at the November 21, 2017 hearing, the Court granted Plaintiff's motion to strike with respect to the legal arguments within Federal Defendants' Statements of Facts.

The Court treats Federal Defendants' additional objections as factual disputes.  Neither Plaintiff's nor the Federal

1     Defendants' statements at oral argument were of help to the

2     Court, as neither party disputes that the Court need not make

3     findings of fact.

4     **C.   Scope of Review**

5     Plaintiff seeks to rely on evidence outside the

6     administrative record to support its claims.  FOR Opp'n, ECF No.

7     49, p. 1.  Federal Defendants counter that the scope of review is

8     limited to the administrative record for both APA and ESA claims.

9     Joint Reply, ECF No. 59, p. 1.

10     In the Ninth Circuit, claims brought under the ESA's citizen

11     suit provision are not subject to the same scope of review

12     restrictions as claims brought under the APA.  Kraayenbrink, 632

13     F.3d at 497 ("Therefore, under Washington Toxics Coalition we may

14     consider evidence outside the administrative record for the

15     limited purposes of reviewing Plaintiffs' ESA claim.").  Federal

16     Defendants argue that Kraayenbrink was a "passing and

17     unprecedented abrogation of the APA," which "flout[ed] decades of

18     Circuit and Supreme Court law."[1]  Joint Reply at 1.  In the seven

19     years since Kraayenbrink was published, the Ninth Circuit has not

20

---

21 [1] As in previous cases, Federal Defendants conflate the standard
of review and scope of review for ESA claims.  The "standard of
review" is governed by the APA, see Karuk Tribe, 681 F.3d at
22 1017; however, scope of review has been interpreted differently.
Federal courts have found "where a claim is brought under [the
23 ESA], the district court "borrow[s] ... the standard [of review]
from the APA," but does "not similarly borrow[ ] the APA's scope
24 of review."  Ellis v. Housenger, No. C-13-1266 MMC, 2015 WL
3660079, at *4 (N.D. Cal. June 12, 2015) (quoting W. Watersheds
25 Project v. FWS, 2013 WL 3270363, at *4 (D. Id. June 26, 2013));
see also Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv., 230
26 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (rejecting the argument
that Karuk Tribe implicitly or silently overruled Kraayenbrink
27 and admitting extra-record evidence on the plaintiffs' ESA
claim).  Federal Defendants have not provided any authority
28 contesting this reasoning.

abrogated its holding on this issue.

Accordingly, the Court has limited its review to the record on Plaintiff's APA claims and has considered extra-record materials with regard to Plaintiff's ESA citizen-suit claims in addition to the over 160,000 pages of the administrative record provided by Federal Defendants.[2]

### D. Section 7 Consultation Duties

Eight of Plaintiff's nine claims relate to Federal Defendants' Section 7 consultation duties. In Claim I, Plaintiff argues that the Corps's 2013 Englebright Dam BA violated the APA because it (1) asserted that maintaining the Englebright Dam is not an action subject to consultation; (2) found that the Englebright Dam's maintenance was nondiscretionary; (3) denied that adverse effects on the Listed Species and critical habitat caused by Englebright Dam's existence were effects of the action; and (4) segregated out permits, licenses, and easements into separate future actions. Am. Compl. at 26–27, ¶¶ 96–99. In Claim II, Plaintiff alleges that NMFS violated the APA by concurring with the Corps's definition of the agency action and conclusions in the 2013 Englebright Dam BA. Id. at 27–28, ¶¶ 100–05. Claim III asserts that NMFS violated the APA in its 2014 BiOp by (1) adopting the Corps's definition of agency action from the 2013 Daguerre Point Dam BA; (2) failing to analyze

_____

[2] The parties violated the Court's status order. Status Order, ECF No. 11. The Status Order unambiguously required the parties to file motions on the issue of record supplementation by January 24, 2017, with briefing on the issue to conclude by February 21, 2017. Id. at 2. No such motions were filed, despite the parties' abject failure to come to an agreement on the issue. Nevertheless, the Court will not impose sanctions on the parties for their noncompliance with the Status Order.

effects of the action on Listed Species by considering dam existence to be part of the environmental baseline; (3) insufficiently explaining its change of position from the 2012 BiOp; and (4) improperly defining the action area. Id. at 28–30, ¶¶ 106–10. In Claim IV, Plaintiff alleges that NMFS violated the APA by replacing the 2012 BiOp with the 2014 BiOp. Id. at 30, ¶¶ 111–13.

Claim V argues that the Corps violated its procedural duties under ESA Section 7(a)(2) by failing to adequately consult with NMFS about the Corps's Yuba River activities. Id. at 30–31, ¶¶ 114–17. In Claim VI, Plaintiff asserts that the Corps violated its substantive duty under ESA Section 7(a)(2) to ensure its actions will not jeopardize the Listed Species because (1) its consultations were inadequate and (2) new information surfaced after NMFS issued the 2014 BiOp and Letter of Concurrence. Id. at 31–32, ¶¶ 118–22. Claim VIII alleges the Corps violated the ESA because the issuance of new scientific and technical information has triggered the Corps's duty to reinitiate consultation with NMFS. Id. at 34–36, ¶¶ 133–39. Finally, Claim IX alleges NMFS violated the APA by failing to reinitiate consultation with the Corps based on the same new information in Claim VIII. Id. at 36–38, ¶¶ 140–46.

At the heart of Plaintiff's Section 7 claims lies a dispute over the scope and definition of the Corps's agency action. According to Plaintiff, Federal Defendants improperly defined, narrowed, segmented, and analyzed the present action in a manner that differed from their previous interpretations. See Am. Compl. at 26–29, ¶¶ 97, 107. Federal Defendants counter that the

more recent interpretation is consistent with prior documents, and also that a change in analysis would be permissible so long as it is accompanied by an explanation.  Fed. Def. MSJ, ECF No. 39, p. 23.

To weigh the parties' arguments, the Court considers Plaintiff's numerous challenges presented individually.  First, the Court resolves whether the Corps's 2013 Englebright BA may be subject to judicial review.  Second, the Court examines what actions fall within the environmental baseline, separate from the present agency action.  Third, the Court determines whether the Corps's activities fit the ESA's broad definition of agency action.  Within this inquiry, the Court explores whether the Corps's activities are (i) affirmative and (ii) discretionary actions that are (iii) guaranteed to occur and (iv) include interrelated and interdependent activities.  Fourth, the Court considers whether Federal Defendants properly determined the scope of the action area in the 2013 and 2014 documents.  Fifth, the Court reviews the sufficiency of the consultation between the Federal Defendants, including whether (i) NMFS has a duty to reidentify the agency action; (ii) the agency action at Englebright required formal consultation; and (iii) the Corps violated its duty to ensure against jeopardy.  Sixth, the Court examines whether any changes in position by Federal Defendants were adequately explained.  Seventh, the Court evaluates whether Federal Defendants had a duty to reinitiate consultation.

///

///

///

1    **1.   The Court May Review the Englebright Biological
          Assessment**

2

3         Section 704 of the APA provides that "final agency action

4    for which there is no other adequate remedy in a court" is

5    subject to judicial review.  5 U.S.C. § 704.  Although BAs

6    generally do not qualify as "final agency actions," a district

7    court "may review a BA where a final agency action, like a

8    [letter of concurrence], expressly relies on it to conclude

9    further action is not necessary."  Oregon Wild v. U.S. Forest

10   Serv., 193 F. Supp. 3d 1156, 1164 (D. Or. 2016) (summarizing that

11   an agency action is "final" when it "mark[s] the consummation of

12   the agency's decisionmaking process" and determines "rights or

13   obligations").

14        Here, NMFS's Letter of Concurrence expressly relied upon the

15   findings of the Corps's 2013 Englebright BA to find that the

16   action was not likely to adversely impact the Listed Species.

17   Corps R. 581:48881–99.  No formal consultation or BiOp took place

18   because of reliance on the BA's determinations and information.

19   While the Letter of Concurrence constitutes the final agency

20   action, the Court is unable to meaningfully analyze it without

21   referencing the BA upon which it was based.  So the Court

22   considers the Corps's 2013 Englebright BA to be a final agency

23   action, reviewable under the APA.

24        **2.   Federal Defendants Properly Delineated the Agency
          Action from the Environmental Baseline**

25

26        The "agency action" is defined as "all activities or

27   programs of any kind authorized, funded, or carried out, in whole

28   or in part, by Federal agencies in the United States or upon the

                                  18

high seas." 50 C.F.R. § 402.02. Distinct from the agency action
is the "environmental baseline," to which effects of the agency
action are added. 50 C.F.R. § 402.02. The environmental
baseline includes "the past and present impacts of all Federal,
State or private actions and other human activities in the action
area" and "the anticipated impacts of all proposed Federal
projects in the action area that have already undergone formal or
early section 7 consultation." Id. "[W]here baseline conditions
already jeopardize a species, an agency may not take action that
deepens the jeopardy by causing additional harm." Nat'l Wildlife
Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 930 (9th
Cir. 2008).

In evaluating the environmental baseline in National
Wildlife Federation, the Ninth Circuit found that current
existence of dams constituted an "existing human activity." 524
F.3d at 930-31. Operation of those dams—generating power by
running river water through the dams' turbines—constituted an
agency action for which the federal defendants had discretion
under the ESA and Northwest Power Act, 16 U.S.C. § 839. Id. at
931. There, like here, dam construction was not part of the
present agency action. Decades before the ESA's enactment, the
California Debris Commission "authorized, funded, or carried out"
construction of Englebright and Daguerre Point Dams, such that
the past and present impacts flowing from the dams' existences
fall within the definition of "environmental baseline." 16
U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. Effects of the agency
action and other interrelated and interdependent activities are
to be added to this environmental baseline when considering

19

whether the action will jeopardize the Listed Species.

The Court finds that Federal Defendants provided a satisfactory and thorough explanation for their actions and therefore did not act arbitrarily or capriciously by properly including effects of the dams' existences in the environmental baseline.

### 3. Federal Defendants' Identification of the Agency Action Was Not Arbitrary or Capricious

### a. A Present and Affirmative Action

The Court construes the term "agency action" broadly. <u>Karuk Tribe of Cal. v. U.S. Forest Serv.</u>, 681 F.3d 1006, 1021 (9th Cir. 2012) (listing cases). There is a two-step inquiry to determine whether an activity constitutes an agency action under the ESA. <u>Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency</u>, 847 F.3d 1075, 1090 (9th Cir. 2017) ("CBD v. U.S. EPA"). First, the Court looks to "whether a federal agency affirmatively authorized, funded, or carried out the underlying activity." <u>Karuk Tribe</u>, 681 F.3d at 1021. Second, the Court determines "whether the agency had some discretion to influence or change the activity for the benefit of a protected species." <u>Id.</u>

"An agency must consult under Section 7 only when it makes an 'affirmative' act or authorization." <u>Id.</u> One such example of an affirmative agency action was the construction and operation of a federal dam. <u>Id.</u> (citing <u>TVA v. Hill</u>, 437 U.S. at 173–74). In <u>TVA v. Hill</u>, the Supreme Court found that the proposed operation of the Tellico Dam, which had never opened, was an affirmative action that would eradicate an endangered species. <u>Id.</u> Similarly, the Ninth Circuit has held that hydropower

operations at over a dozen federal dams on the Columbia River constituted an agency action. Nat'l Wildlife Fed'n, 524 F.3d at 923. Other affirmative actions include pesticide product registration, Wash. Toxics Coal. v. Envtl. Prot. Agency, 413 F.3d 1024, 1033 (9th Cir. 2005), and reregistration, CBD v. U.S. EPA, 847 F.3d at 1091; approval of oil spill response plans, Alaska Wilderness League v. Jewell, 788 F.3d 1212 (9th Cir. 2015); approval of Notices of Intent to conduct mining activity, Karuk Tribe, 681 F.3d at 1021; and renewal of water supply contracts, Nat. Res. Def. Council v. Jewell, 749 F.3d 776, 780 (9th Cir. 2014) ("NRDC v. Jewell").

Conversely, the Ninth Circuit has found that a failure to act does not require consultation under Section 7(a)(2). W. Watersheds Project v. Matejko, 468 F.3d 1099, 1107-08 (9th Cir. 2006) ("Of particular significance is the affirmative nature of these words—'authorized, funded, carried'—and the absence of a 'failure to act' from this list."). The Ninth Circuit also concluded that a private party's ongoing operation of a hydropower project, pursuant to an earlier approved permit, was not an affirmative act by the federal agency. Cal. Sportfishing Prot. All. v. F.E.R.C., 472 F.3d 593, 598 (9th Cir. 2006). Likewise, the Ninth Circuit found that an agency's failure to regulate private parties' water diversions pursuant to those parties' pre-existing rights-of-way was not an agency action. Matejko, 468 F.3d at 1107-08.

Plaintiff asserts that the Corps's affirmative actions consisted of (1) the dams' operations and maintenance and (2) operation of ancillary facilities near the dams. Here, the

present operations described by the Corps for Englebright Dam
include visual security and safety inspections, maintenance of
recreational facilities, continued administration of maintenance
service contracts, and continued administration of outgrants.
Corps R. 581:48882-83. The Corps wrote that operation of
outgrants associated with the Englebright Dam hydropower
facilities were future actions for which the Federal Energy
Regulatory Commission would consult in 2016 and 2023. Corps R.
581:48882. At Daguerre Point Dam, the Corps described its
present operations as operating and maintaining the fish passage
facilities, maintaining a staff gage, administering licenses for
observing fish and installing flashboards, and conservation
measures. Corps R. 532:42332-33.

The activities listed by the Corps as actions in the
Englebright and Daguerre Point Dams BAs constitute activities
affirmatively carried out by a federal agency. 50 C.F.R.
§ 402.02. Plaintiff has not identified any other specific
actions the Corps has "affirmatively authorized, funded, or
carried out" without consulting with NMFS. See CBD v. U.S. EPA,
847 F.3d at 1090. Thus, the Court has evaluated whether the
Corps has discretion over only the activities it identified as
agency actions in its BAs.

### b. A Discretionary Action

The Supreme Court has noted that an overly broad reading of
ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), would "cover[], in
effect, almost anything that an agency might do" and "partially
override every federal statute mandating agency action." Nat'l
Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 664

(2007).  Accordingly, NMFS and FWS promulgated regulations limiting the consultation requirement to discretionary agency actions.  50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.").  These regulations require consultation "so long as the federal agency has 'some discretion' to take action for the benefit of a protected species."  NRDC v. Jewell, 749 F.3d at 780 (quoting Karuk Tribe, 681 F.3d at 1024).  This discretion arises when "an agency, acting in furtherance of a broad Congressional mandate, chooses a course of action which is not specifically mandated by Congress and which is not specifically necessitated by the broad mandate."  Nat'l Wildlife Fed'n, 524 F.3d at 929.

Section 7 does not require consultation for actions "that an agency is required by statute to undertake."  NRDC v. Jewell, 749 F.3d at 780 (quoting Home Builders, 551 U.S. at 669).  This lack of discretion exists "only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit."  Id. at 784.  "An agency 'cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives.' "  Karuk Tribe, 681 F.3d at 1024 (quoting Wash. Toxics, 413 F.3d at 1032).

The Ninth Circuit has considered the discretionary nature of actions several times since the Supreme Court's Home Builders decision.  In NRDC v. Jewell, the en banc panel found the agency retained "some discretion" to act in a manner that would benefit the delta smelt during renewal of water rights contracts.  749

F.3d at 785.  Conversely, in <u>Grand Canyon Trust</u>, a statutory requirement to prepare and submit an annual operating plan to Congress each year was a "specific non-discretionary act," not subject to consultation.  691 F.3d at 1018.

Here, where there are multiple dams that were authorized by separate acts and built at different times, several sources of legislative authority must be considered.  The Corps cited nine authorities that govern their discretion over the present actions.  Corps R. 81:4626–4639, 532:42326–27.  Those authorities are (1) The California Debris Act; (2) The Rivers and Harbors Act of 1935; (3) Flood Control Act of 1970; (4) National Dam Inspection Act of 1972; (5) Water Resources Development Act 1986; (6) Water Resources Development Act 1996; (7) National Dam Safety Program Act of 1996; (8) Public Law 109-460; and (9) Engineer Regulation 1105-2-100.  <u>Id.</u>

The California Debris Act, 33 U.S.C. § 661, <u>et seq.</u>, created a commission to restore navigability of rivers impacted by hydraulic mining debris.  One such authorized means of ameliorating the impacts of mining was to construct debris-restraining dams.  33 U.S.C. § 685.  Similarly, the Rivers and Harbors Act authorized and funded "construction, completion, repair, and preservation" of structures to retain mining debris, including the Daguerre Point Dam.  Corps R. 81:4627–29.

The Flood Control Act of 1970, Section 216, authorizes the Corps to review projects and report "to Congress with recommendations on the advisability of modifying the structures or their operation, and for improving the quality of the environment in the overall public interest."  33 U.S.C. § 549a.

The Water Resources Development Act of 1986 and 1996 further
authorize the Corps to perform ecosystem restoration, subject to
certain limitations.  33 U.S.C. § 2283(b); 33 U.S.C.
§ 2330(a)(1).

In the realm of dam safety, the National Dam Inspection Act,
Pub. L. 92-367 (Aug. 8, 1972) authorizes the Corps to carry out a
national program of inspection of non-Federal dams for the
purpose of protecting human life and property.  The National Dam
Safety Program Act of 1996, Pub. L. 104-303 (Oct. 12, 1996),
amended in 2006, Pub. L. 109-460 (Dec. 22, 2006), goes further to
require Secretary of the Army to undertake a national dam
inspection program.  33 U.S.C. § 467d.  The Engineering
Regulations require authorization by Congress when project
purposes are added or deleted.  Corps R. 81:4635.

Plaintiff has identified several statutes that it believes
grant the Corps broad discretion to determine whether or how to
maintain the dams.  FOR MSJ, ECF No. 33, pp. 11-12.  Those
statutes describe the Corps's general duty to adopt plans that
improve river navigability, 33 U.S.C. § 664; ability to construct
sediment-impounding dams "when appropriations are made therefor
by law," 33 U.S.C. § 685; responsibility to include environmental
protection as one of its primary missions in operating and
maintaining water resources projects, 33 U.S.C. § 2316;
authorization to carry out a program to improve environmental
quality when feasible and consistent with the project's
authorized purpose, 33 U.S.C. § 2309a(a-b); capability to carry
out a project that improves the environment's quality and is cost
effective, including dam removal, 33 U.S.C. § 2330(a)(1-2); and

duty to mitigate fish and wildlife losses for projects constructed after November 17, 1986, 33 U.S.C. § 2283.

The Court has carefully reviewed these sources and finds that the Corps does not have the discretion to discontinue dam inventory and safety inspections.  The Corps properly classified these actions as non-discretionary, which does not require Section 7 consultation.  See 50 CFR § 402.03; Home Builders, 551 U.S. at 666 (2007).  The Corps also correctly identified that remaining activities were discretionary.  Corps R. 550:43451, 81:4560.  In sum, Federal Defendants' assessment of the Corps's discretion was not arbitrary or capricious.

### c.  An Action Guaranteed to Occur

In Claim III, Plaintiff further argues that it was improper for NMFS to consider voluntary conservation measures, subject to funding availability, as part of the agency action in the 2014 BiOp.  Am. Compl. at 28-29, ¶ 107.  Federal Defendants fail to address this issue in their briefing.

The 2013 Daguerre Point Dam BA includes both "protective conservation measures," which the Corps has committed to incorporate into the Proposed Action, Corps R. 81:4518, and "voluntary conservation measures," which are "subject to the availability of funding."  Corps R. 81:4522.

NMFS may rely on mitigation measures to support a finding that an agency action poses no jeopardy to the Listed Species.  See Rock Creek All. v. U.S. Fish & Wildlife Serv., 663 F.3d 439, 444 (9th Cir. 2011).  "[A] sincere general commitment" to future mitigation, however, may not be included as part of a proposed action unless there are "specific and binding plans" for

implementation. <u>Nat'l Wildlife Fed'n</u>, 524 F.3d at 935–36. In the present case, the Corps's voluntary conservation measures lack solid guarantees that they will actually occur because they are contingent on uncertain funding availability. Benefits of these potential conservation measures should not have factored into the BA and BiOp unless the Corps showed "clear, definite commitment of resources" for them. <u>Id.</u> Judging from the record, this commitment is lacking.

Where the allegedly defective mitigation measure was not the primary reason for the agency's no-jeopardy finding, other courts have declined to invalidate the BiOp. See <u>Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.</u>, 99 F. Supp. 3d 1033, 1055–56 (N.D. Cal. 2015) (listing cases).

Similar to <u>Klamath-Siskiyou Wildlands Center</u>, the facts here are distinguishable from <u>National Wildlife Federation</u>. 524 F.3d at 935–36. There, the Ninth Circuit found NMFS "relied <u>significantly</u> on [the] future [mitigation measures]" without "specific and binding plans." <u>Id.</u> (emphasis added). Here, NMFS did not rely on the voluntary mitigation measures as the primary reason for its finding that the agency actions at Daguerre Point Dam were not likely to result in jeopardy to the Listed Species. Corps R. 532:42640. Reviewing the entirety of the 2014 BiOp, the Court does not find that voluntary mitigation measures constituted a critical or significant factor in NMFS's no-jeopardy determination. Accordingly, the Court does not find the no-jeopardy conclusions made in NMFS's 2014 BiOp biological opinion to be arbitrary and capricious.

           **d.    Interrelated and Interdependent Activities**

Several of Plaintiff's claims take issue with the Corps's exclusion of its issuance and administration of permits, licenses, contracts, and easements from the proposed actions in the 2013 BAs. Am. Compl., pp. 26-28, ¶¶ 97, 107. Plaintiff argues that Federal Defendants acted arbitrarily and capriciously by dividing up activities at Englebright, Daguerre, and the Licensed Facilities into separate unrelated agency actions with smaller action areas. FOR MSJ at 15. The Court disagrees.

While ESA regulations make clear that the Corps's issuance of permits, licenses, contracts, and easements all qualify as "actions" under the ESA. See 50 C.F.R. § 402.02 (providing that "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid" are examples of actions), the question is whether it was improper for the Corps to classify these activities as individual actions, rather than continuing the Corps's previous practice of bundling these activities together into a single action.

The ESA requires the consulting agency to consider the "entire agency action." Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988). The effects of the agency action include the impact of "interrelated and interdependent" actions, defined as actions "that are part of a larger action and depend on the larger action for their justification" (interrelated) or actions "that have no independent utility apart from the action under consideration" (interdependent). 50 C.F.R. § 402.02. "The test for interrelated or interdependent effects is 'but for' causation, i.e., but for the proposed action, would the other action occur." Nat. Res. Def. Council v. Rodgers, 381 F. Supp.

2d 1212, 1234-35 (E.D. Cal. 2005).

Segmented consultations of a single agency action are counter to the ESA's requirements because an "agency action could ultimately be divided into multiple small actions, none of which, in and of themselves would cause jeopardy." Rodgers, 381 F. Supp. 2d at 1237 n.43 (quoting Am. Rivers v. U.S. Army Corps of Eng'r, 271 F. Supp. 2d 230, 255 (D.D.C. 2003)).

Plaintiff argues that the licenses and contracts are interrelated because (1) the two dams were built as part of "an integrated project" to control mining debris within the Yuba River; (2) the Brophy Diversion depends on the existence of the Daguerre dam for its head; (3) the Cordua Diversion is physically attached to Daguerre; and (4) the Narrows 1 and 2 powerhouses draw water from the Englebright Reservoir and their operations are coordinated with the dam. FOR MSJ at 13-14. The Court finds that these activities, however, do not form part of a larger cohesive action. They do not meet the definitions of interrelated or interdependent actions because they do not depend on the presently proposed agency actions—outgrants, recreational activities, and fish ladders—for their justification and have independent utility apart from the proposed actions. See 50 C.F.R. § 402.02. "But for" the outgrants, recreational activities, and fish ladder, activity at the Powerhouses and the Cordua Diversion could still occur.[3] See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 807 F.3d 1031, 1047 (9th

---

[3] The Corps's issuance of permits, licenses, contracts, and easements similarly do not qualify as cumulative effects under the ESA, as they would be future Federal, not State or private activities. See 50 C.F.R. § 402.02.

Cir. 2015).

When renewed, these licenses and contracts will be their own agency actions, subject to consultation requirements where the agency yields discretion.  Federal Defendants' exclusion of activities from the 2013 Englebright BA and 2014 BiOp was not arbitrary or capricious.

### 4. Federal Defendants' Assessment of the Action Area Was Not Arbitrary or Capricious

In Claim III, Plaintiff asserts that NMFS violated the APA by improperly identifying the "action area" within the 2014 BiOp.  Am. Compl. ¶ 109.  Plaintiff contends that the smaller action area in the BiOp failed to consider impacts from Englebright Dam and Narrows 2 in its jeopardy and adverse modification analysis.  FOR MSJ at 15 n.10.

"Action area" is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02.  Generally, "determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion."  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 902 (9th Cir. 2002).  To withstand judicial scrutiny, the agency must explain the "scientific methodology, relevant facts, or rational connections linking the project's potential impacts" to the action area boundaries.  Id.

The ESA Consultation Handbook provides that the description of the action area is a biological determination for which the consulting agency—here, NMFS—is responsible.  Corps R. 472:37064.  Although agreement between the Corps and NMFS is "desirable,"

id., NMFS's interpretation takes precedence where NMFS and the Corps disagree.

The 2014 BiOp defines the action area as including "the lower Yuba River starting at a point approximately 135 feet upstream of the downstream of the Narrows II powerhouse and approximately 415 feet downstream of Englebright Dam, downstream to the confluence of the Yuba and Feather rivers." Corps R. 532:42345. The 2014 BiOp goes on to acknowledge that the Listed Species may swim further upstream than the boundary of the action area, up until the point when they are blocked by the Englebright Dam. Id. The BiOp concludes that this area, upstream of the action area boundary, would not be affected by the proposed action. Id.

Although NMFS's action area determination could have been more detailed, this "biological determination" qualifies as a scientific judgment for which the Court must be "at its most deferential." N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011) (quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)). The 2014 BiOp's action area boundaries discussed relevant facts and made a rational connection to the proposed action's potential impact. See Native Ecosystems, 304 F.3d at 902. The Court does not find that NMFS acted arbitrarily and capriciously in defining the action area in the 2014 BiOp.

///
///
///
///

**5.    The Federal Defendants' Consultation Was Sufficient**

       **a.    There Was No Duty To Reidentify the Agency Action**

    Plaintiff argues that NMFS abdicated its responsibility to "correctly identify the action that is subject to consultation." Am. Compl. at 28-29.  Quoting from the ESA Consultation Handbook, Plaintiff argues that NMFS need not agree with the Corps's identification of the agency action or action area and must instead make its own independent determination.  FOR Opp'n at 4.

    The statute and accompanying regulations are not clear about the discretion that the consulting agency has to reidentify or redefine the agency's proposed action.  See 50 C.F.R. § 402.11(f) (specifying that a preliminary BiOp can be confirmed as final after the consulting agency "reviews the proposed action" and finds no significant changes); 50 C.F.R. § 402.14(a) (requiring both the action agency and consulting agency to initiate consultation where any agency action that may affect listed species or critical habitat is identified).

    The ESA Consultation Handbook, to which the Court affords Skidmore deference, San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 634 (9th Cir. 2014), instructs the acting agency to "[p]rovide descriptions of the proposed action and the action area (area including all direct and indirect effects)." Corps R. 472:37064.  Where there is no complete or formal description of the proposed action, the consulting agency prepares a draft comprehensive project description, which is sent

to the action agency for review to eliminate inaccuracies.  Id.
The Handbook goes on to provide that where the action agency and
consulting agency disagree on the action area, the consulting
agency's determination prevails on that biological determination.
Id.  There was no similar distinction made for the proposed
action, where the language implies that the action agency has the
final say.

Based on the Handbook's language and the Court's deference
to it, the Court finds that NMFS did not act arbitrarily or
capriciously in accepting the Corps's identified agency action.
See Defs. of Wildlife v. U.S. Fish, No. 16-CV-01993-LHK, 2016 WL
4382604, at *18 (N.D. Cal. Aug. 17, 2016) (rejecting an argument
that FWS acted arbitrarily and capriciously by relying on the
Corps's description of its proposed project).

### b. The Agency Action at Englebright Is Not Likely to Adversely Affect the Listed Species

In several claims against Federal Defendants, Plaintiff
alleges that the agencies have improperly determined that the
proposed action at Englebright is not likely to adversely affect
the Listed Species and their critical habitat, and in doing so,
failed to engage in required formal consultation.  Am. Compl. at
28, 31, ¶¶ 103, 116.

"If an agency determines that action it proposes to take may
adversely affect a listed species, it must engage in formal
consultation."  Bennett v. Spear, 520 U.S. 154, 158 (1997).
Formal consultation is not required if preparation of a BA or
informal consultation determines that the proposed action is not
likely to adversely affect any listed species or critical

habitat.  50 C.F.R. § 402.14(b)(1).  The agency's determination

on adverse effects will be upheld unless it "entirely fail[s] to

consider an important aspect of the problem," relied on improper

factors, or offers an implausible explanation.  See Wild Fish

Conservancy v. Salazar, 628 F.3d 513, 529–30 (9th Cir. 2010)

(quoting The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir.

2008)).

As analyzed above, the Court has found that Federal

Defendants' identification of the proposed actions and the

Corps's discretion is not arbitrary and capricious.  Review of

the 2013 Englebright Dam BA and Letter of Concurrence illustrates

that Federal Defendants thoroughly reviewed the proposed actions

during informal consultation and provided plausible explanations

for the finding that these actions were not likely to adversely

affect the Listed Species and their critical habitat.  See Corps

R. 550:43461–69, 581:48884–86.  Based on this finding, it was not

necessary for the agencies to engage in formal consultation for

this proposed action.  See 50 C.F.R. § 402.14(b)(1).  Federal

Defendants' finding that the proposed action at Englebright Dam

was not likely to adversely affect the Listed Species and their

critical habitat was not arbitrary and capricious.

### c. The Corps Did Not Violate Its Duty to Ensure Against Jeopardy

Plaintiff's Claim VI asserts that the Corps violated its

duty to ensure against jeopardy, in violation of Section 7(a)(2).

Am. Compl. at 31–32 ¶¶ 118–22.  Plaintiff bases this claim on the

alleged insufficiency of the Letter of Concurrence and 2014 BiOp,

as well as "new information" about and a modification of the

actions.  Id.

"Section 7 of the ESA imposes a substantive duty on the
[agency] to ensure that its actions are not likely to jeopardize
the continued existence of the listed fish or result in
destruction or adverse modification of critical habitat."  Ctr.
for Biological Diversity v. U.S. Bureau of Land Mgmt., 698 F.3d
1101, 1127 (9th Cir. 2012) ("CBD v. U.S. BLM") (citing 16 U.S.C.
§ 1536(a)(2)).  When reviewing an agency's reliance on a BiOp,
the Court examines whether that reliance was arbitrary and
capricious.  Aluminum Co. of Am. v. Adm'r, Bonneville Power
Admin., 175 F.3d 1156, 1162 (9th Cir. 1999).  An agency's
reliance on "admittedly weak" information is not arbitrary or
capricious unless there is information the agency did not take
into account that undercuts its conclusions.  Pyramid Lake Paiute
Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1415 (9th
Cir. 1990).

Here, the Court has determined that the 2014 BiOp upon which
the Corps relied was not flawed, but rather evaluated the agency
action and scope of discretion in far greater detail than any of
the prior documents.  This enhanced scrutiny resulted in NMFS
reaching different conclusions and recommendations than were made
in the 2012 BiOp.  While the scientific information makes clear
that the baseline conditions jeopardize the Listed Species,
Plaintiff has not provided information that indicates the present
proposed actions increase that risk by causing additional harm.
See Nat'l Wildlife Fed'n, 524 F.3d at 930 ("Agency action can
only 'jeopardize' a species' existence if that agency action
causes some deterioration in the species' pre-action

35

condition.").

The Court finds that the Corps did not violate its substantive duty under Section 7(a)(2).

**6.    The Explanation for Position Changes Was Adequate**

In Claim III, Plaintiff alleges that NMFS insufficiently explained the changes in its reasoning between the 2012 BiOp and 2014 BiOp.  Am. Compl. 29, ¶ 108.

As the Ninth Circuit recently noted in <u>Defenders of Wildlife</u>, "[a]gencies are entitled to change their minds." 856 F.3d at 1262 (quoting <u>Butte Envtl. Council v. U.S. Army Corps of Eng'r</u>, 620 F.3d 936, 946 (9th Cir. 2010)).  That change must be accompanied by "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Humane Soc'y of U.S. v. Locke</u>, 626 F.3d 1040, 1051 (9th Cir. 2010) (emphases and internal quotation marks omitted). Where an agency dramatically changes its approach without a rational explanation, its new interpretation is entitled to less deference.  <u>Nat'l Wildlife Fed'n</u>, 524 F.3d at 933.

The Corps has thoroughly explained the differences in its reasoning from prior BAs.  <u>See</u> Corps R. 81:4071–101, 550:43448–51.  Following the 2012 BiOp, the Corps "deconstructed its proposed action to more clearly identify which activities were subject to 'discretionary Federal involvement or control' " and which "were non-discretionary and would therefore not be included in the Corps' request for consultation."  Corps R. 581:48888–89. The Corps then sought to reinitiate consultation with NMFS to provide more accurate information on agency discretion, the proposed action's scope, and recent scientific and technical

findings.  Corps R. 581:48889-90, 532:42324-25.  Separate BAs on the dams were submitted because the Corps found "each dam has a separate authorization and appropriation, and because the actions at Englebright and Daguerre are wholly separate and are not dependent upon each other to operate."  Corps R. 581:48890.

NMFS's description of its change in reasoning is less detailed.  For the most part, NMFS appears to adopt the Corps's reasoning and reconsiders its prior BiOp based on this change:

> In the 2012 BiOp, NMFS identified several additional actions as interrelated and interdependent actions associated with the project description in the Corps 2012 BA (Corps 2012a). Due to modifications in the proposed action, and new information regarding Corps discretion and authority, those actions are no longer identified in this BiOp as interrelated and interdependent actions.

Corps R. 532:42345.  NMFS's explanation, albeit quite brief, indicates that it examined the relevant data, made a rational connection between the facts, and explained its change in position from the 2012 BiOp to the 2014 BiOp and Letter of Concurrence.  The Court finds that NMFS's change in position was not arbitrary or capricious.

**7.    Reinitiation of Consultation Was Not Required**

Plaintiff's eighth and ninth claims allege that Federal Defendants violated the ESA (Claim VIII) and APA (Claim IX) when they failed to reinitiate consultation after the issuance of new information.  Am. Compl. at 34-38, ¶¶ 133-46.

"The ESA's implementing regulations require an action agency to reinitiate formal consultation with the consulting agency when 'new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent

not previously considered' (the 'new information' reinitiation trigger)." Defs. of Wildlife, 856 F.3d at 1264-65 (citing 50 C.F.R. § 402.16(b)). Reinitiation is also required when an identified action is subsequently modified in a manner the BiOp did not consider. 50 C.F.R. § 402.16(c); see, e.g., Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1088 (9th Cir. 2015), cert. denied, 137 S. Ct. 293 (2016) (holding that FWS's expansion of critical habitat required the Forest Service to reinitiate consultation). "However, 50 C.F.R. § 402.16 does not require agencies to stop and reinitiate consultation for 'every modification of or uncertainty in a complex and lengthy project.'" Conservation Cong. v. Finley, 774 F.3d 611, 619 (9th Cir. 2014) (quoting Sierra Club v. Marsh, 816 F.2d 1376, 1388 (9th Cir. 1987)).

The Ninth Circuit has found reinitiation is appropriate where a new critical habitat was designated, Cottonwood, 789 F.3d at 1084-85; where promised conservation measures fail, CBD v. U.S. BLM, 698 F.3d at 1115; and where future actions differ from the BiOp assumptions, N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 981 (9th Cir. 2006). The Ninth Circuit has also cautioned that new information must relate to the direct and indirect effects of the agency action, excluding cumulative effects of private and state activities. Sierra Club, 816 F.2d at 1387.

Plaintiff believes that new studies and plans, such as the Yuba River Ecosystem Restoration Reconnaissance Study and Habitat Management and Restoration Plan, provide a basis upon which to reinitiate consultation between the agencies. Am. Compl. at 35,

¶¶ 136-37.  While Plaintiff repeatedly states that the study and plan provide "new information," at no point does Plaintiff provide any guidance as to how that information details effects not previously considered in the consultation.  See 50 C.F.R. § 402.16(b) (requiring reinitiation where "new information" affects a species or habitat "in a manner or to an extent not previously considered" (emphasis added)).  The Court does not read the regulations as requiring reinitiation of consultation every time a relevant study is funded or published.  As the Ninth Circuit pointed out in Finley, a new study only requires reinitiation of consultation where the original consultation failed to address the effects described in the new information.  774 F.3d at 619-20 n.3 (affirming denial of a reinitiation claim based on the publication of a recovery plan, containing "new" studies drawn from old information).  As Plaintiff has not described what new effects the study and plan detail that the Federal Defendants did not previously consider, these exhibits do not provide cause for reinitiation.

    As further evidence of new information, Plaintiff's motion cites the declaration of a fisheries biologist who states that the conservation measures in the 2014 BiOp have not improved conditions for the Listed Species because the dams block migration and populations of the Listed Species have continued to decline.  FOR MSJ at 22-23; Reedy Decl. ¶¶ 10, 14-20, 25; Ex. B, C.  The biologist also states that the large woody material management program did not function as planned because materials washed away during large storm events.  Reedy Decl. ¶¶ 24-25, Ex. F.  High storm flows similarly closed the fish ladders in early

2017, months after Plaintiff filed its Amended Complaint.  Reedy

Decl. ¶ 22, Ex. D.

The ESA requires a plaintiff to provide notice of a violation at least sixty days prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i).  The Supreme Court has concluded strict compliance with citizen-suit timeliness and identification requirements best serves the goal of the notice requirement. Klamath-Siskiyou Wildlands Ctr. v. MacWhorter, 797 F.3d 645, 650 (9th Cir. 2015) (citing Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987)).  Notice should "at a minimum provide sufficient information so that the notified parties could identify and attempt to abate the violation." Id. (quoting Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 522 (9th Cir. 1998)).

Here, many of the violations alleged in Plaintiff's Motion for Summary Judgment arose not only after Plaintiff's notice to Federal Defendants, but also after amendment of the complaint in December 2016.  Plaintiff's notice and reinitiation claims do not adequately notify Federal Defendants of violations arising from new circumstances like the storm events in 2017.  Thus, these events fail to provide cause to order Federal Defendants to reinitiate consultation.

In conclusion, the Court grants summary judgment to Federal Defendants and Intervenor on all claims arising under Section 7. Claim I is denied because Plaintiff has not shown that the Corps's 2013 Englebright Dam BA was arbitrary or capricious in its assessment of the present proposed action, the Corps's discretion, and adverse effects.  Claim II is denied because

Plaintiff has not shown that NMFS was arbitrary or capricious in concurring with the 2013 Englebright Dam BA.  Claim III is denied because Plaintiff failed to show that NMFS acted arbitrarily or capriciously in its change of position and issuance of the 2014 BiOp.  Claim IV is denied because Plaintiff has not shown NMFS's replacement of the 2012 BiOp with the 2014 BiOp was arbitrary or capricious.  Claims V, VIII, and IX are denied because Plaintiff failed to show that Federal Defendants consultation was insufficient and that new information required Federal Defendants to reinitiate consultation.  Claim VI is denied because Plaintiff did not show that the Corps violated its duty not to jeopardize Listed Species.

**E.    Section 9 Prohibition Against Authorized Taking**

Plaintiff also brings a takings claim under Section 9. Plaintiff's Claim VII alleges that the Corps has violated ESA by taking the Listed Species without authorization.  Am. Compl. at 32–34, ¶¶ 123–32.  Plaintiff argues that the taking results from the continued existences of the two dams, as well as the fish ladders at Daguerre Point Dam and introduction of invasive species through recreational activities.  Id. at 32–33, ¶ 124.

"All persons, including federal agencies, are specifically instructed not to "take" endangered species."  TVA, 437 U.S. at 184.  The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  "Harm" includes significant habitat modification or degradation that actually kills or injures wildlife.  See Babbitt v. Sweet Home Chapter of Cmty. for Great Or., 515 U.S. 687, 707–

09 (1995). Whether activities qualify as a "taking" under Section 9 of the ESA is a distinct inquiry from whether they "may affect" a species or its critical habitat under Section 7. Karuk Tribe, 681 F.3d at 1028.

NMFS granted the Corps an incidental take statement for its activities related to sediment removal, maintenance and debris removal in the fish ladders, gravel augmentation, and woody instream material management. Corps R. 532:42637–40. Should the Corps exceed the amount or extent of taking specified in the incidental take statement, the agencies must reinitiate consultation. 50 C.F.R. § 402.16. Taking within the limits of the incidental take statement, however, cannot constitute an impermissible taking.

The main harms Plaintiff alleges, apart from those covered by the incidental take statement, flow from the dams' existences. The Court has already found Federal Defendants did not act arbitrarily or capriciously in concluding that the dams' existences do not constitute a present or continuing "agency action." Even if the dams' existences did constitute an agency action, this action appears to be outside the agency's discretion. While the Ninth Circuit has not clearly spoken on this issue, a similar case in this district found that an agency cannot be liable where it has no discretion over the activities resulting in the alleged taking. Nat. Res. Def. Council v. Norton, 236 F. Supp. 3d 1198, 1239 (E.D. Cal. 2017).

Relying on the Supreme Court's reasoning in Home Builders, Norton analogized to the holding in Department of Transportation. v. Public Citizen, 541 U.S. 752 (2004) and found it inappropriate

to impose Section 9 liability on an agency performing a nondiscretionary duty. 236 F. Supp. 3d at 1239. Contra Seattle Audubon Soc'y v. Sutherland, No. C06-1608MJP, 2007 WL 1577756, at *1 (W.D. Wash. May 30, 2007) (holding Public Citizen, as a NEPA case, was inapposite to the plaintiff's ESA Section 9 claims, without addressing the language in Home Builders). The Court finds Norton's lengthy analysis of this issue, including application of the broader principles from Public Citizen and Home Builders, more persuasive than the reasoning articulated in Seattle Audubon.

Because the Corps has not affirmatively engaged in a discretionary activity that had prohibited impact on the Listed Species, Plaintiff has not proven a violation of Section 9. See Palila v. Hawaii Dep't of Land & Nat. Res., 639 F.2d 495, 497 (9th Cir. 1981).

## V.   CONCLUSION AND ORDER

For the reasons set forth above:

(1)  Plaintiff's Motion for Summary Judgment is DENIED;

(2)  Federal Defendants' Motion for Summary Judgment is GRANTED; and

(3)  Intervenor's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Dated: February 21, 2018

_____
JOHN A. MENDEZ
UNITED STATES DISTRICT JUDGE