Christopher Sproul (Bar No. 126398)
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com

Patricia Linn (Bar No. 253015)
Law Office of Patricia Linn
115 Oakdale Avenue
Mill Valley, CA 94941
Telephone: (415) 847-7024
Email:  patricialinn19@gmail.com

Attorneys for Plaintiff
FRIENDS OF THE RIVER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF THE RIVER, a non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL MARINE FISHERIES SERVICE, *et al.*, <br><br> Defendants. | Case No. 2:16-cv-00818-DJC-JDP <br><br> **PLAINTIFF'S SUR-REPLY RESPONSE TO DEFENDANT-INTERVENOR YUBA COUNTY WATER AGENCY'S REPLY TO PLAINTIFF'S OPPOSITION** |

## I. INTRODUCTION

Plaintiff Friends of the River ("FOR") hereby responds to Yuba County Water Agency ("YCWA")'s Statement in Support of Federal Defendants' Motion To Renew Stay and Reply to Plaintiff's Opposition (Dkt. 129) ("YCWA Reply") and accompanying Declaration of Willie Whittlesey (Dkt. 129-2) ("Whittlesey Declaration"). If the Court is inclined to consider the YCWA Reply and the Whittlesey Declaration, the Court should further also consider FOR's response to certain mischaracterizations in these YCWA filings. YCWA presents inaccurate contentions concerning the need for prompt issuance of the new NMFS Biological Opinion ("Daguerre BiOp") for the U.S. Army Corps of Engineers ("the Corps")'s operations at Daguerre Point Dam ("Daguerre") that NMFS is presently working on and that is the subject of NMFS's request to extend the current stay in this case. NMFS has indicated it expects to complete the Daguerre BiOp by the end of July 2024. YCWA apparently opines that ongoing discussions between YCWA, NMFS, and the California Department of Fish and Wildlife ("CDFW") are likely in the not-too-distant future to end in an agreement that will render the Daguerre BiOp meaningless shortly after it is issued. On this basis, YCWA apparently contends that there is no need to expedite or set a deadline for NMFS's issuance of the Daguerre BiOp--which NMFS should perhaps be excused from ever issuing (even though this is the means that NMFS has represented it will implement to comply with the Ninth Circuit remand and this Court's judgment in this case). YCWA further apparently contends that there is no need for the Court to lift the stay and allow FOR its day in court, perhaps for the next two years and perhaps indefinitely, on whether the harms caused by Daguerre and Englebright Dams' existence and the existence and operations of water diversion and powerhouse infrastructure on the Yuba River are subject to Endangered Species Act ("ESA") regulation. YCWA apparently contends that YCWA, NMFS, and CDFW are negotiating a potential new approach to resource management on the Yuba River that will address the threats to ESA-protected fish that has prompted FOR's citizen suit--thus warranting keeping this case on ice for years more, perhaps indefinitely.

These contentions lack merit. It is now well past the time that the Court should call a halt to the Federal Defendants and YCWA's delay tactics and resolve this now near eight-year-old case with a definitive answer to the still unanswered question at the heart of FOR's suit: whether the ESA requires the Corps to implement measures to mitigate the adverse impacts to the Listed Species that Daguerre and Englebright's existence cause and whether the Corps presently has ESA duties to curb the adverse impacts to the Listed Species from the water diversion and power infrastructure operations that it effectively licenses.

## II. FACTUAL BACKGROUND

As discussed in the accompanying Supplemental Declaration of Aaron Zettler-Mann ("Zettler-Mann Declaraton"), the Whittlesey Declaration discusses a Term Sheet that YCWA, CDFW, and NMFS entered into on May 12, 2023. This Term Sheet sets forth a framework for developing a settlement agreement ("Settlement Agreement") to implement a Yuba River Watershed Habitat Restoration Plan ("Restoration Plan"). The Settlement Agreement and Restoration Plan would have YCWA, in conjunction with CDFW and if/as approved by multiple other agencies, implement a new fishway to allow Spring Chinook, Steelhead, and Green Sturgeon to migrate upstream past Daguerre. The Settlement Agreement and Restoration Plan would further have YCWA and other actors, presumably including CDFW, NMFS, and possibly the Corps, work together to develop and implement a "Reintroduction Program" to reintroduce Spring Chinook above Englebright to currently unoccupied historical Spring Chinook habitat within the Yuba River watershed upstream of New Bullards Bar Reservoir.

The Whittlesey Declaration discusses the new NMFS Biological Opinion for Daguerre that NMFS is presently working on and that NMFS has indicated it expects to complete by the end of July 2024 ("Daguerre BiOp"). The Whittlesey Declaration apparently opines that the Term Sheet and prospective Settlement Agreement and Restoration Plan will render the Daguerre BiOp meaningless shortly after it is issued because the Settlement Agreement and Restoration Plan will provide for new approaches to the adverse impacts of Daguerre and Englebright on Spring Chinook, Steelhead, and Green Sturgeon that will moot out any analysis in the Daguerre BiOp. However, as discussed below, this is plainly not the case.

III. **ARGUMENT**

YCWA, NMFS, and CDFW negotiated the Term Sheet and are continuing to negotiate the Settlement Agreement without the participation of the various environmental organization stakeholders that have demonstrated years of involvement in and concern with the Yuba River's fisheries resources. Zettler-Mann Declaration, ¶ 8. The Settlement Agreement, if it occurs, is likely to be quite controversial with some or all of these various environmental organizations and they are likely to require significant changes to the Settlement Agreement before they would be persuaded to support rather than bring litigation to challenge it. *Id*. Moreover, the Settlement Agreement's various components will require multiple agencies regulatory approvals before it could be implemented. From years of experience at this point, one matter that is abundantly clear: regulatory agencies with authority over Yuba actions (including NMFS, the Corps, CDFW, the California Department of Water Resources, the Federal Energy Regulatory Commission, and the California State Water Resources Control Board) have moved slowly in taking positions or action upon the regulatory issues presented to them. Given the many years that will almost certainly be consumed by continued agency deliberation over the measures called for in the Settlement Agreement combined with the dire (and continuing worsening) condition of Spring Chinook, Steelhead, and Green Sturgeon, the analysis in the Daguerre BiOp will still be urgently needed to (hopefully) put into place interim measures that the Corps should be implementing at Daguerre to at least reduce the very substantial harms to the Listed Species that Daguerre is continuing to perpetuate. *See id*.

Among other things, the Whittlesey Declaration addresses the Lower Yuba Accord Fisheries Agreement that YCWA and multiple other parties (including environmental organizations) agreed to in 2007 ("Yuba Fisheries Accord"). Whittlesey Declaration, ¶¶ 18-20. The Yuba Fisheries Accord, as the Whittlesey Declaration indicates, specifies certain minimum in-stream flows in the Yuba River that YCWA's water diversions and the actions of other water diverters on the Yuba River are supposed to maintain for the benefit of Yuba River fisheries resources, including the Listed Species *Id*. Recent study, however, has revealed that the Spring Chinook and Steelhead populations in the Yuba River and throughout their range have

continued to decline, prompting knowledgeable observers to question whether the in-stream flows provided for in the Yuba Fisheries Accord are sufficient to ensure the survival or recovery of Spring Chinook and Steelhead. Zettler-Mann Declaration, ¶ 9. Multiple knowledgeable members of the various environmental organizations with a stake in the Yuba River's fisheries resources have concluded that the Yuba Fisheries Accord should be intentionally and thoughtfully reevaluated and likely revised. *Id*. The reevaluation needed to address these issues would be complex and, with past history as a guide, prolonged and time-consuming. *Id*.

    The Term Sheet makes plain that memorializing and establishing instream flows will be a critical part of the Settlement Agreement. It also is quite clear that YCWA is aiming to have the Settlement Agreement memorialize and establish flow regimes no more restrictive than presently provided for in the Yuba Fisheries Accord. For the reasons noted above, this is likely to be controversial with the various environmental group stakeholders and likely further to be a matter that regulatory agencies will find quite difficult to resolve. Working out these flow concerns will almost certainly take months and more likely years of regulatory agency processing--preventing the Settlement Agreement from effectuating a quick resolution of the Daguerre fishway and Reintroduction Program components that are at the heart of the Settlement Agreement. Moreover, if YCWA, NMFS, and/or CDFW attempt to finalize the Settlement Agreement and lock in the Yuba Fisheries Accord instream flow regime without the reevaluation analysis referred to above, this is almost certainly to be challenged by one or more environmental organizations. *Id.*, ¶ 10.

    In addition to the above concerns, the Reintroduction Program will certainly not be a measure that the various environmental group stakeholders will agree solves the problem presented by Englebright blocking spring Chinook and Steelhead migration to the upper Yuba River watershed, much less in a short timeframe that would warrant having NMFS hold up issuing further biological opinion analysis on the Yuba River until the Settlement Agreement is entered into. *Id.*, ¶ 11.

    The Whittlesey Declaration contends that the Reintroduction Program will aim "to expand the geographic distribution of Spring Chinook in the North Yuba River upstream of

New Bullards Bar Reservoir, restoring the functionality of over 30 miles of ancestral habitat for the first time in more than 100 years. In doing so, the Reintroduction Program will improve spring-run Chinook salmon habitat capacity and diversity, contributing to their recovery." Whittlesey Declaration, ¶ 36. However, there are several obstacles which make it a certainty that the Reintroduction Program will not in any meaningful way contribute to the survival and recovery of Spring Chinook. The Reintroduction Program would involve trapping Spring Chinook in the lower Yuba River somewhere below Englebright and then transporting them via motor vehicles to the upper Yuba River above New Bullards Bar Reservoir. The expense alone of transporting sufficient numbers of adult Spring Chinook upstream to spawn and then sufficient numbers of juvenile Spring Chinook downstream to out-migrate to the ocean to mature into potentially spawning adults will be too large to make a project sufficiently large to add meaningfully to the Spring Chinook population possible. Zettler-Mann Declaration, ¶ 12. Additionally, it is a long drive from the lower Yuba River to the upper Yuba River watershed above New Bullards Bar Reservoir. The long transport times needed to bring fish in this fashion from the lower Yuba River to the upper Yuba River would alone very likely create significant fish mortality that would prevent this project from successfully augmenting the Spring Chinook population in any meaningful way. Adding to this problem, capturing Spring Chinook in the river and moving them into vehicles for upstream transportation would further likely cause significant harm and mortality to the fish.

      In a recent meeting with environmental group representatives on February 14, 2024, CFDW staff confirmed their agreement that these problems will prevent the Reintroduction Program's trap and haul effort from creating an ecologically significant Spring Chinook population in the upper Yuba. *Id.* Furthermore, the infrastructure needed to capture Spring Chinook in the lower Yuba River to be able to transport them upstream does not exist and securing both the funding and regulatory approvals to build and then operate this infrastructure will also necessarily involve significant obstacles that could take years to resolve, even if it were possible to overcome these obstacles. *Id.* In sum, any knowledgeable and candid observer would come to the conclusion that the Reintroduction Program will never in any

meaningful fashion augment the population of Spring Chinook in the Yuba--and it may take many years before any form of pilot program that could even demonstrate that Spring Chinook can survive and reproduce in the upper Yuba River could be implemented. *Id*.

Moreover, even if a successful pilot program could someday be implemented, implementation of such a pilot program will achieve little, as historical information already well establishes that Spring Chinook can survive and reproduce in the upper Yuba River. It is well documented that a population of salmon did exist in these reaches of the river before the construction of Englebright and New Bullards Dams. Establishing a pilot study population of Spring Chinook in the upper Yuba River will thus do nothing significant for improving the survival and recovery of Spring Chinook, which will continue to require a means to achieve volitional fish passage past Englebright and other present artificial barriers to upstream Spring Chinook migration. *Id*.

An additional problem with the contention that the Reintroduction Program will address in any meaningful fashion Englebright's adverse impacts on the Listed Species is that the Reintroduction Program is apparently focused only on Spring Chinook (the only fish mentioned in the Whittlesey Declaration). Historically, Steelhead also inhabited the Yuba River above Englebright and Steelhead have suffered great population loss in the Yuba due to Englebright, but the Reintroduction Program as presently conceived is not designed to do anything to address harms to Steelhead.

In sum, contentions that the present discussions between YCWA, NMFS, and CDFW are likely in the next two years to lead to a viable new approach to lessening the harms to the Listed Species caused by Daguerre, Englebright, Yuba River water diversions, and Yuba powerhouses are meritless. These discussions form no reasonable basis for continuing to deny FOR from securing a final resolution of the question its ESA claims have presented to this Court for the past eight years: whether the ESA requires the Corps to implement measures to remediate the harms caused by Daguerre and Englebright's existence and the further harms caused by the water diversions and powerhouses that the Corps licenses. The remedial actions that YCWA, NMFS, and CDFW are presently contemplating in their Term Sheet and

potential Settlement Agreement will not, even if implemented sometime in the far off future, obviate the need for the Court to answer these fundamental questions. The most serious adverse impact to Spring Chinook and Steelhead at stake in this case is the harm caused by Englebright completely blocking these fishes' access to the upper Yuba. None of the actions contemplated by the Term Sheet/Settlement Agreement will make any meaningful dent in Englebright's adverse impacts. The question of whether Englebright's harms are subject to ESA regulation, a question that the Federal Defendants and YCWA continue to evade the Court ruling upon, will remain a live one even if the Settlement Agreement's unlikely remedial measures are in fact someday implemented. Moreover, the question of whether the harms from Daguerre's existence (including Daguerre's formation of a plunge pool that promotes predation on the Listed Species), are subject to ESA regulation will also remain a live one even if the Settlement Agreement's unlikely remedial measures are in fact someday implemented. YCWA, NMFS, and CDFW presently contemplate that the Settlement Agreement will allow Daguerre to remain in place--with neither the Corps nor any other actor under any legal obligation to do anything to lessen the harms associated with Daguerre remaining in place (which will include its promotion of predation and its likely interference with the fishway's operation if the latter is ever built. Daguerre's continued existence will almost certainly under some flow's conditions interfere with the Listed Species being able to find the new fishway). It is now time for the Court to lift the stay and reach the long unanswered questions still pending concerning the Corps' ESA obligations.

Dated:  February 29, 2024                              Respectfully submitted,

<span style="text-decoration: underline;">*Patricia Linn*</span>
Patricia Linn
Attorney for Friends of the River