UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF THE RIVER,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE, et al.,<br><br>Defendants. | No. 2:16-cv-00818-DJC-JDP<br><br><br>ORDER |

This action concerns Federal Defendants' compliance with the Endangered Species Act ("ESA") in connection with two dams, the Daguerre Point Dam and the Englebright Dam, located on the Yuba River.  Litigation over these two dams and federal agencies' compliance with the ESA in connection with the dams' management is long-standing, extending back many years before the present case.  Currently before the Court are the Cross-Motions for Summary Judgment filed by the parties.  Also before the Court is Defendant-Intervenor Yuba County's Motion for Leave to Amend its Answer.

For the reasons stated below, the Court grants in part and denies in part Federal Defendants' and Intervenor-Defendant's Motions for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.  Plaintiff's Motion for Summary

1

Judgment is granted in part and denied in part. Intervenor-Defendant's Motion for Leave to Amend its Answer is also denied.

## BACKGROUND

The lengthy history of Daguerre and Englebright, as well as the litigation surrounding them, is well known to the Court and parties. The Court will not endeavor to summarize the entirety of that lengthy history here. Senior District Judge John A. Mendez's order on the prior motion for summary judgment covers much of this background (*see* ECF No. 62 at 5–11), and the parties have also done an admirable job of summarizing the details of this history in their briefing.

In short, this litigation concerns compliance with the ESA by the United States Army Corps of Engineers ("Corps") and the National Marine Fisheries Service ("NMFS") in connection with the Corps' activities related to two dams, Daguerre Point and Englebright, on the Yuba River, and the impact of those actions on the "Listed Species" in the Yuba River. The Listed Species are Central Valley Spring Chinook Salmon, Central Valley Steelhead, and North American Green Sturgeon.

In 2018, Judge Mendez granted summary judgment in favor of Federal Defendants and Intervenor-Defendant Yuba County Water Agency ("YCWA") in connection with Plaintiff's challenge to NMFS's 2014 Biological Opinion ("BiOp") for Daguerre and the 2014 Letter of Concurrence ("LOC") for Englebright. (*See* ECF No. 62.) Plaintiff Friends of the River ("FOR") appealed that order to the Ninth Circuit and, on review, the Ninth Circuit ruled that the 2014 BiOp and LOC were arbitrary and capricious as NMFS had "fail[ed] to provide a reasoned explanation for why it changed positions on whether the continued existence of the dams and the hydroelectric facilities abutting Englebright constitute agency action[.]" *FOR v. NMFS*, 786 Fed. Appx. 666, 669 (9th Cir. 2019). The court also reversed the summary judgment order as it related to Plaintiff's section 9 "take" claim based on licenses and easements granted to third parties on the basis that the order did not address these claims. *Id.* at 670.

2

On remand, the Federal Defendants elected to issue a further explanation for the change in position in the 2014 LOC for Englebright (the "LOC Supplement" (ECF No. 104-1)), but to issue a new BiOp for Daguerre.  Despite the issuance of new documentation, the parties agreed to continue litigating disputes related to these documents within this action.  Plaintiff now challenges the 2014 LOC (as modified by the LOC Supplement) and the 2024 BiOp.

Briefing of the Cross-Motions for Summary Judgment is now complete.  (Pl.'s Mot. (ECF No. 166-1); Fed. Defs.' Mot. & Opp'n (ECF No. 172-1); YCWA Mot. & Opp'n (ECF No. 175); Pl.'s Opp'n & Reply to Fed. Defs. (ECF No. 186); Pl.'s Opp'n & Reply to YCWA (ECF No. 185); Fed. Defs.' Reply (ECF No. 190); YCWA Reply (ECF No. 191); Pl.'s Surreply to YCWA (ECF No. 196).)  The Court took this matter under submission without oral argument at the request of the parties pursuant to Local Rule 230(g). (ECF No. 200.)

## LEGAL STANDARD

Ordinarily, summary judgment is appropriate under Rule 56 where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[i]n a case involving review of a final agency action under the Administrative Procedure Act ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D. D.C. 2006).  "A court conducting [Administrative Procedure Act] judicial review does not resolve factual questions, but instead determines 'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-cv-02800-TLN, 2014 WL 2092385, at *4 (E.D. Cal. May 19, 2014) (quoting *Mainella*, 459 F. Supp. 2d at 90).  In a case brought under the APA, summary judgment is the "mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review." *Conservation Cong.*, 2014 WL 2092385, at *4.

Claims under the ESA are also reviewed under the APA standard of review. *See W. Watersheds Project v. Kraayenbrink*, 632 F.2d 472, 481 (9th Cir. 2011).  Under the APA standard, a decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Id.*; 5 U.S.C. § 706(2)(A).  Such review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Accordingly, a court may only set aside a decision if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

**DISCUSSION**

Plaintiff's lawsuit is most easily understood as having four main constituent parts: (1) procedural claims under section 7 of the ESA which assert that Federal Defendants improperly defined the scope of the Corps' "agency action" in preparing the 2014 LOC, as supplemented by the 2022 LOC Supplement, and the 2024 BiOp; (2) an APA claim that raises largely similar arguments as the procedural section 7 claims in connection with the 2014 LOC, the 2024 BiOp, and the 2013 Englebright BA; (3) a claim that the Corps has violated its substantive duties under section 7 of the ESA; and (4) a claim asserting the Corps is liable for a take under section 9 the ESA. These sections contain additional sub-arguments and claims but appropriately represent the full scope of this suit.  As such, the Court will address the Motions for Summary Judgment within this structure.

The Court also notes that both Federal Defendants and Intervenor-Defendant YCWA have moved for summary judgment.  However, while YCWA's Motion raises some additional arguments, it is largely redundant of Federal Defendants' Motion.  As

this suit can be resolved almost exclusively through the Cross-Motions for Summary Judgment between Plaintiff and Federal Defendants, the Court largely references and relies on that briefing.  Based on the overlap in arguments, Plaintiff argues in its Reply and Opposition to Defendant-Intervenor YCWA that YCWA lacks standing to join in many of the specific arguments they raise.  Given the Court's reliance on the briefing from Federal Defendants, the Court need not address these arguments.

## I.  Procedural Violation of ESA Section 7

Plaintiff's procedural claims make up the bulk of this litigation.  As Plaintiff correctly suggests, "the fundamental legal argument [within Plaintiff's APA and ESA Section 7 claims] . . . is the same." (Pl.'s Mot. at 12.)  In the simplest terms, Plaintiff contends that Federal Defendants improperly defined the scope of the agency action in connection with Daguerre and Englebright.  Plaintiff believes that (1) the scope of the action was impermissibly narrowed to exclude the dams themselves as they presently exist, and (2) Federal Defendants failed to consider the "whole" action by separating the dams and excluding the licenses and easements granted to third parties.  Plaintiff puts it this way: "The decades long litigation over the [Corps' ESA] duty to protect listed fish species in the Yuba River boils down to what is the correct legal definition of the Corps's Yuba River Action, for ESA section 7 consultation and substantive ESA section 7 compliance purposes." (Mot. at 1.)  This is an apt description of the issue presented here.

ESA section 7 imposes both procedural and substantive requirements on Federal agencies.  Where an agency authorizes, funds, or carries out an "action," the agency must "insure that [the] action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2).  Centrally at issue here is what properly defined as an "agency action" within the meaning of section 7.  The implementing regulations for this section define an agency action as follows:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
>
> (a) actions intended to conserve listed species or their habitat;
>
> (b) the promulgation of regulations;
>
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
>
> (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.2.

"There is 'little doubt' that Congress intended agency action to have a broad definition in the ESA . . . ." *Karuk Tribe of Cal. v U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (citations omitted).  Determining whether an activity is properly considered an "agency action" is a two-part inquiry. *Id.* at 1021.  "First, [the court] ask[s] whether a federal agency affirmatively authorized, funded, or carried out the underlying activity.  Second, [the court] determine[s] whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Id.*

### A.  The Englebright and Daguerre Dams as Discretionary Action

In the 2024 BiOp and the supplemented 2014 LOC, the existence of Englebright and Daguerre Point Dams was excluded from the defined agency action and was instead considered to be part of the environmental baseline.  This is not a new approach and was partially the subject of the initial litigation in this action.  Both dams were originally analyzed as an agency action until 2014, when NMFS issued the 2014 LOC for Englebright and the 2014 BiOp for Daguerre that designated the existence of the dams to be part of the environmental baseline and not an agency action by the Corps.  The exclusion of these dams from the 2014 LOC and BiOp was

6

partially the basis for the Ninth Circuit's reversal of the prior summary judgment order. *See FOR*, 786 Fed. Appx. at 669–70.  In reversing the prior summary judgment decision, the Ninth Circuit did not rule that exclusion of the dams from the baseline was per se impermissible.  But the Ninth Circuit did find that NMFS' failure to provide a reasoned explanation for the change in position from inclusion of the dams as an agency action to exclusion of the dams in the 2014 LOC and BiOp was arbitrary and capricious.  *Id.*  This was because the failure to provide an adequate explanation "precluded [the court] from undertaking meaningful judicial review" of the substantive merits of the 2014 BiOp and LOC.  *Id.* at 670.  On remand, Federal Defendants produced the 2024 LOC Supplement and 2024 BiOp, which continued to consider Englebright and Daguerre as part of the environmental baseline.

Plaintiff agrees that Federal Defendants complied with their obligations on remand to provide an explanation for the change in position by issuing an additional explanation in support of the 2014 Englebright LOC and the 2024 BiOp for Daguerre. (Pl.'s Opp'n & Reply to Fed. Defs. at 7.)  But Plaintiff continues to assert that Federal Defendants' reasoning is incorrect and the dams themselves should be considered agency action.  (*Id.* ("While these explanations may resolve the Ninth Circuit remand's requirement that NMFS provide additional explanation for its course reversal, these explanations do not justify NMFS's reversal, which remains contrary to law.").)  Plaintiff contends both that the Corps has discretion to remove or neglect the dams and that the Corps has discretion to modify the dams, though Plaintiff mixes these arguments together.

In the LOC supplement, NMFS explained that the Corps had originally asserted that it did not have authority to remove or modify the dams in the Biological Assessment ("BA") that the Corps issued for Daguerre and Englebright in 2012.  (LOC Supplement at 2.)  At that time, the NMFS instead created its own "deconstructed action" where NMFS continued to consider the dams part of the agency action.  (*Id.*)  When the Corps again requested consultation on Englebright in 2013, the BA issued

by the Corps "provided additional context for and several clarifications to USACE's statutory authorities concerning Englebright Dam." (*Id.*)  NMFS explains that in creating the 2014 LOC, NMFS considered Englebright to be part of the environmental baseline "due to USACE-defined limits of their discretion." (*Id.* at 3.)  The Corps also provided additional detail explaining their assessment of the limits of their discretion. (Corps' Explanation Letter (ECF No. 104-2).)  In the Corps' view, Congress had authorized Englebright's construction and "[o]nly Congressional actions to de-authorize the structures can alter or terminate this responsibility and thereby allow the maintenance of the structures to cease." (*Id.* at 10 (quoting 2013 Englebright BA).)  The Corps explained that it maintains limited "mandatory and nondiscretionary responsibilities associated with dam maintenance and safety," and lacks the authority to perform modifications beyond "minor modifications" without Congressional action. (*Id.* at 11–12.)

This position is similarly reflected in the 2024 BiOp and the associated BA for Daguerre.  In the BA, the Corps defined Daguerre as part of the environmental baseline based on the fact that it was a pre-existing project and "[o]nly Congressional action to change the authorization or de-authorize an existing Civil Works project can alter or terminate" the Corps' responsibility to operate or maintain the dam "in such a manner that the projects continue to serve their Congressionally authorized purposes[.]" (C_DPD:00659[1]; *see* C_DPD:00658–60.)

Plaintiff has not established that the Corps decision that Daguerre and Englebright were not an agency action was an abuse of discretion.  As stated above, in determining whether something is an agency action, the Court engages in a two-

---

[1] In order to maintain consistency with the briefing provided by the parties, the Court adopts a roughly similar citation format used by the parties.  Citation to the original 2016 Administrative Record will appear as C:XXX:YYYYY for Corps' records, where XXX indicates the document number and YYYYY indicates the page number, and NMFS:YYYYY for NMFS records where YYYYY indicates the page number.  Both parties supplemented the 2016 Administrative Record.  Citations to the Corps Corrected Supplemental Record appear as C_ENG:YYYYY or C_DPD:YYYYY where YYYYY is the page number.  Similarly, citations to NMFS' Second Corrected Supplemental Record appear as NMFS_ENG:YYYYY and NMFS_DPD:YYYYY where YYYYY again is the page number.

part inquiry, with the Court first asking whether "a federal agency affirmatively authorized, funded, or carried out the underlying activity." *Karuk Tribe of Cal.*, 681 F.3d at 1021.  Here, that first inquiry supports that Federal Defendants appropriately determined the dams were not an agency action.

Nothing in the record indicates that the Corps authorized, funded, or carried out the construction of the dams.  In fact, the dams were constructed decades ago with the authorization and funding of Congress.

In 1902, Congress enacted the Rivers and Harbors Act of 1902.  Among many other things, it appropriated funds for the California Debris Commission eventually used to construct the dam presently known as Daguerre Point.  *See* Rivers and Harbors Act of 1902, Public Law No. 154, 32 Stat. 1079.  The Rivers and Harbors Act of 1902 relied on House Document 431 from the 52nd Congress stating the funds were provided "[f]or carrying out the provisions of the Act of Congress providing for the restraining or impounding of mining debris in California, in accordance with the report submitted in House Document Numbered Four hundred and thirty-one, Fifty-sixth Congress, first session[.]" *Id.*  House Document 431 is the "Report of the California Debris Commission Regarding the Construction of Certain Works with a View to the Improvement of Navigation in the Sacramento and Feather Rivers" produced in 1900.  H.R. Doc. No. 56-431 (1990).  That report recommended "the construction of four restraining barriers and a settling basin in the bed of the river, the structures to be provided with necessary weirs and conduits to regulate the inflow and outflow of water, and to cause a deposition of the finer material carried in suspension[.]" *Id.* at 2.  After the Commission faced difficulties with the originally planned barriers, the project was modified.  Daguerre Point Dam was built instead using these funds at one of the four locations recommended by this report and approved by Congress.[2]  *See id.* at 4–6; *see also* C:255:18722.

---

[2] In their briefing, Plaintiff states that "When flood flows destroyed two prior Corps dams on the Yuba, the Corps elected not to rebuild them, but to build a single new different dam instead, signaling that it did not interpret the 1893 Act to mandate maintenance of any given Yuba dam structure."  (Pl's Opp'n

Similarly, Englebright was constructed pursuant to the Rivers and Harbors Act of 1935. The 1935 Act stated "[t]hat the following works of improvement of rivers, harbors, and other waterways are hereby adopted and authorized, to be prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers, in accordance with the plans recommended in the respective reports hereinafter designated and subject to the conditions set forth in such documents[.]" Rivers and Harbors Act of 1935, Public Law No. 409, 49 Stat. 1028. Englebright was one of the improvements in question and was constructed in accordance with another report cited by Congress. *Id.*

The California Debris Commission, which was originally established in 1893 by Congress, was ultimately abolished in 1986. The majority of the Commission's duties and responsibilities, including maintenance of Daguerre and Englebright, were transferred to the Corps.

Considering this history, it is readily apparent that the Corps had no involvement in the authorization, funding, or carrying out the existence of the dams. Englebright and Daguerre were created through Congressional authorization and funding and constructed decades prior by a different federal agency[3]. Plaintiff has not provided any basis for the Court to find that the Corps has taken any affirmative action to create the dams. Plaintiff asserts that "the dams are affirmative agency actions because they fall within Congress's intended broad ESA section 7 definition 'encompassing all activities or programs of any kind authorized, funded, or carried out, in whole or in part' by the agency including actions directly or indirectly causing

---

& Reply to Fed. Defs. at 1–2.) This appears to be a misinterpretation of the history of Daguerre. The events Plaintiff is referencing occurred in 1907. (C:255:18722.) Thus, contrary to the suggestion in Plaintiff's statement, these events occurred while the California Debris Commission was responsible for the project and long before the Corps became involved.

[3] That the Commission was responsible for building the dams does not insulate the Corps simply by virtue of those being separate agencies. Instead, the Court mentions this fact to further emphasize how substantially removed the creation of Daguerre and Englebright was from any involvement of the Corps.

modifications to the land, water, or air." (Pl.'s Mot. at 13 (quoting *Karuk Tribe of Cal.*, 681 F.3d at 1021).) But despite making this assertion, Plaintiff fails to identify how the Corps has authorized, funded, or carried out the dams. Notably, both Daguerre and Englebright are not "operated" by the Corps; they are concrete barriers with unregulated spillways. (C_DPD:00495; C:550:43442–43.) This renders this case distinct from other cases where agencies have engaged in affirmative agency action via the operation of a dam. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173–74 (1978). In contrast, Daguerre and Englebright were erected centuries ago. The Corps has not engaged in any affirmative agency action in connection with their creation, nor do they require any operation that would constitute an ongoing activity.[4]

As Plaintiff has not identified how the dams are authorized, funded, or carried out by the Corps, Plaintiff's assertion that Englebright and Daguerre constitute agency action must fail at the first step.[5] *See Karuk Tribe of Cal.*, 681 F.3d at 1021. Even if Plaintiff had established the first prong was met, the Corps also lacks discretion over the existence of the dams.

---

[4] As addressed further below, the Corps and other federal agencies <u>have</u> undertaken agency actions in connection with facilities licenses. But that those agencies have taken some actions that are tangentially connected to the dams does not render the dams themselves an agency action.

[5] At various points in their briefing, Plaintiff euphemistically reference the Corps' "decision" to continue maintenance of the dams. (*See* Pl.'s Mot. at 15 ("The 1893 Act and 1935 Act grant the Corps discretion . . . on whether or how to maintain those structures . . . ."); Pl.'s Opp'n & Reply to Fed. Defs. at 1 ("[T]he Corps wrongly ignores that it is *not* compelled to maintain the Dams as they were originally built. The [1983 Act] and the [1935 Act] grant the Corps discretion . . . whether or how to maintain those structures . . . .") Plaintiff stops short of suggesting that the Corps should simply cease maintenance of the dams and let them fall into a dangerous state of disrepair, accepting that "[o]ther statutes and Corps regulations may require that the Corps keep the Dams safe[.]" (Pl.'s Opp'n & Reply to Fed. Defs. at 2.) Plaintiff instead vaguely suggests that the Corps could alter "how" it maintains the dams without ever specifying what exactly this means. Plaintiff appears to use the Corps' maintenance activities as a doorway to assert that the dams continue to exist via agency action. But Plaintiff has not identified any specific maintenance activities that it believes should be agency action. Regardless, even if maintenance is an agency action, Plaintiff has not established that the agency has any discretion so as to satisfy the second prong of the agency action analysis. Congress has passed statutes that separately impose duties related to the inspection and maintenance of dams for safety purposes. *See e.g.* 33 U.S.C. § 467 *et seq.*

Plaintiff argues that the Corps has the discretion to remove or alter the dams. (Pl.'s Opp'n & Reply to Fed. Defs. at 2.)  But Plaintiff fails to cite any meaningful support for this position.  Plaintiff first points to the 1983 Congressional Act establishing the California Debris Commission and the 1935 Rivers and Harbors Act to argue that these acts grant the Corps "discretion as to what structures to build in the Yuba, if any, and discretion on whether or how to maintain those structures so long as the Corps advances the broad goals of being 'effective as against the encroachment of and damage from debris resulting from mining operations, natural erosion, or other causes' to the Sacramento and San Joaquin Rivers' tributaries." (*Id.* at 1 (quoting 33 U.S.C. § 664); *see* Pl.'s Mot. at 15-17.)  But Plaintiff fails to cite any portion of these acts that identifiably give the Corps discretion to remove or neglect the dams.

As evidence of the Corps' alleged broad discretion to "modify the project" that is the dams, Plaintiff gestures to the fact that despite four barriers being proposed in House Document 431, the California Debris Commission ultimately altered the plan to construct Daguerre after the initial barriers proved unsuccessful.  (Pl.'s Mot. at 16 n.5.)  But the fact that, in the earliest phase of implementation, the Debris Commission may have had some discretion over the exact details of the enactment of the 1902 Rivers and Harbors Act does not confer on the Corps authority to remove or neglect the dams a century later.   Plaintiff has not identified any discretionary authority granted by Congress to the Corps that permits the Corps to remove or cease upkeep to maintain the continued existence of dams that were created via a congressional act.

Plaintiff also notes other projects undertaken in connection with the dams to argue that the Corps has discretion on how to operate the dams.  (Pl.'s Mot. at 16.)  These projects include gravel augmentation, the installation of flashboards at the top of the dam, and a Large Woody Material ("LWM") placement program, among others.  The implementation of such measures in the past could suggest that the Corps maintains some discretionary authority to take actions surrounding Daguerre and Englebright.  However, the fact that the Corps maintains some authority to enact

12

additional programs surrounding the dams does not mean that they have discretionary authority to meaningfully alter or modify the dams themselves.  Notably, none of the prior actions identified by Plaintiff involve altering the dams themselves.  Thus, these actions are consistent with the Corps' view that it lacks any discretion to remove or modify the dams themselves.

Plaintiff cites a number of cases in support of the claim that the Corps has consultation duties based on its alleged discretion in the management of Englebright and Daguerre.  These cases bear little resemblance to the one before the Court.  Plaintiff cites two decisions from the district of Oregon in *Northwest Environmental Defense Center ("NEDC")  v. U.S. Army Corps of Engineers*, concerning the operation of dams in the Willamette River Basin.  *NEDC*, 479 F. Supp. 3d 1003 (D. Or. 2020); *NEDC*, 558 F. Supp. 3d 1056 (D. Or. 2021).  Unlike the dams at issue in *NEDC*, and as noted earlier, Daguerre and Englebright involve no operation in any meaningful sense.  As Federal Defendants note, any activities the Corps has undertaken in connection with the dam, such as the usage of flashboards and fish ladders, have been included in the section 7 analysis that has already been conducted.  *Yurok v. United States Bureau of Reclamation*, 654 F. Supp. 3d 941 (N.D. Cal. 2023) and *San Luis Obispo Coastkeeper v. Santa Maria Valley Conservation District*, 49 F. 4th 1242 (9th Cir. 2022) are inapplicable on a similar basis.  The former also addresses the agency's discretion in the amount of water it released from the Twitchell Dam, while the latter concerns the operation of the Klamath Project, a multi-state project that involved "an extensive series of canals, pumps, diversion structures, and dams capable of routing water to approximately 230,000 acres of irrigated land in the upper Klamath River Basin."  *Id*. at 950 (internal citations omitted).  As with the *NEDC* cases, these bear no resemblance to the present case as they consider the discretion over agency actions in the operation of dams and other projects, not whether the existence of otherwise static dams was an agency action.

Though the Oregon district court made no explicit findings on this point, it is worth noting that the court in *NEDC* appears to accept that the existence of dams might be part of the environmental baseline. *See NEDC*, 479 F. Supp. 3d at 1018. In its 2020 order, the court noted that the Corps had argued that the impact on the listed species was due to "the physical presence of the dams, not [the Corps'] discretionary operations." *NEDC*, 479 F. Supp. 3d at 1018. The court did not reject that the dams themselves might not be an agency action but rejected this argument on the basis that this did not mean that other agency actions could not worsen the action, stating "even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Id*.

This distinction – between the existence of the dams and the operation of the dams – and the fact that the mere existence of the dams may be part of the environmental baseline is also supported by Ninth Circuit authority. For example, in *National Wildlife Federation v. United State Army Corps of Engineers*, 384 F.3d 1163 (9th Cir. 2004), the Ninth Circuit noted the distinction between operation and existence of dams in addressing claims under the Clean Water Act that the Corps had acted arbitrarily or capriciously in determining that its operation of dams did not cause an increase in water temperature. In doing so, the court also stated that "Where the Corps has concluded reasonably that the sole cause of the temperature exceedences is the existence of the dams and not any discretionary method of operating the dams, we do not interpret the compliance provision of the CWA as requiring that the dams authorized by Congress be removed." *Id*. at 1178.

*National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 930 (9th Cir. 2008), also draws the same distinction between the existence of the dams and their operation. The Ninth Circuit's decision there lends direct support for the idea that, in the context of the ESA, dams can properly be considered part of the environmental baseline, with the court stating the following:

14

> The current existence of the FCRPS dams constitutes an "existing human activity" which is already endangering the fishes' survival and recovery. Although we acknowledge that the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act, 16 U.S.C. § 839.

*Id.* at 931 (citations omitted).  Plaintiff correctly notes that this case presents a vastly different case than *National Wildlife Federation*.  In that case, the court considered and rejected the use of a hypothetical "reference operation" to segregate discretionary and non-discretionary actions connected to the operation of the dams and move the non-discretionary actions into the baseline.  *Id.* at 926.  The agency then conducted a "comparative" analysis that considered only whether the discretionary actions would have an appreciable net effect on a species.  *Id.*  Regardless of the factual differences and the distinct legal questions at issue, this does not alter the fact that the court there accepted the view that the existence of the dams was part of the environmental baseline.[6]

Plaintiff also cites two out of circuit cases – *Britt v. U.S. Army Corps of Engineers*,769 F.2d 84 (2d Cir. 1985) and *United States v. 2,606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286 (5th Cir. 1970) – for the proposition that the Corps has the discretion to "replace the Dams with alternative structures that secure the Acts' purposes . . . ."  (Pl.'s Opp'n & Reply to Fed. Defs. at 3.)  But these cases do not support the idea that the Corps has the authority to remove Englebright or Daguerre and replace them.  *Britt* concerned the construction of a replacement bridge at an alternate location in connection with the congressionally approved

---

[6] Plaintiff also argues that the later decision of *San Luis & Delta Mendota Water Authority v. Jewell,* 747 F.3d 581 (9th Cir. 2014), clarified that "when agencies have some discretion over their actions, '*Home Builders* does not require the agency to segregate discretionary from non-discretionary actions when it considers the environmental baseline.'"  (Pl.'s Opp'n to Fed. Defs. at 6 (quoting *Jewell*, 747 F.3d at 639).)  This is ultimately not relevant here; the question here is whether the existence of the dams, in their entirety, constitute agency action.  This case does not raise the same question of mixed discretionary and non-discretionary action that was at issue in *National Wildlife Federation*.

enlargement of a channel.  769 F.2d at 86.  *Britt* is readily distinguishable on the basis that the decision to build the bridge at an alternate location was made at the construction stage based on a modification to a preliminary plan, which Congress approved.  *Id.* at 89–90.  The court in *Britt* found that the plan adopted by Congress had specifically contemplated relocation and Congress had given the agency "considerable discretion to approve modifications of the project."  *Id.  2,606.84 Acres of Land in Tarrant County, Texas*, is also inapposite.  While that case does concern the Corps and alteration to a dam, it again addresses modifications to the planned construction of a dam made before construction began.  432 F.2d 1292.  These cases thus provide no support for the proposition that the Corps has unfettered discretion to remove or alter upkeep of Englebright or Daguerre decades after their construction without further Congressional action.

In sum, Plaintiff has not established that the Corps' determination that the dams were not an agency action was arbitrary and capricious.  To the contrary, it appears that Daguerre and Englebright are not authorized, funded, or carried out by the Corps, and that the Corps lacks discretion to influence or change the existence of Daguerre and Englebright for the benefit of the protected species.  *See Karuk Tribe of Cal.*, 681 F.3d at 1020.  Plaintiff has neither identified any activities conducted by the Corps that satisfy the first prong, nor identified any discretionary authority to remove or alter the dams that would satisfy the second prong.  In the absence of any evidence, Plaintiff's claim that the 2014 LOC and 2024 BiOp violate Section 7 based on the inclusion of the dams in the environmental baseline must fail.

### B.  Consultation on the Whole Action

Plaintiff also contends that the Corps violated its section 7 duties by failing to request consultation on the whole agency action.  Plaintiff's contention is that, properly defined, the Corps' action consists of the entirety of their activities on the Lower Yuba River.  In particular, Plaintiff takes issue with the separation of the two

16

dams from each other and the exclusion of the "Facilities Licenses" from the most recent section 7 consultations.[7]

"[T]he ESA requires the biological opinion to analyze the effect of the *entire* agency action."  *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (emphasis in original).  This is because segmentation of agency action can result in an erosion of environmental protections, "so long as each step on the path to destruction is sufficiently modest."  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523 (9th Cir. 2010).

### 1.  Separation of Daguerre and Englebright

Plaintiff has not established that the Corps' decision to request separate consultation of the agency's activities near Daguerre and Englebright was arbitrary and capricious and thus violates section 7.  The Corps reasonably determined that these actions were appropriately considered separate actions.  This admittedly does represent a change in the historical approach taken to Daguerre and Englebright.  However, the Corps explained that it has now determined that the dams were separate actions as they were created by separate authorizations by Congress over three decades apart, because the dams function independently of each other.  (*See* Corps' Explanation Letter at 2, 8–10.)

Plaintiff has not established that this determination was arbitrary and capricious.  In their Motion, Plaintiff cites the graph of the Corps' activities in the Lower Yuba River that was produced in connection with the 2013 Englebright BA as illustrative of

---

[7] It is clear from elsewhere in Plaintiff's briefing that Plaintiff's contention is that the whole action is both dams and the Facilities Licenses.  (Pl.'s Mot. at 12 ("the Dams and the Facilities Licenses together are the Corps's whole Action"); *id.* at 23 ("the Corps unlawfully segmented this overall Action into separate pieces by 1) splitting Englebright and Daguerre operation and maintenance into separate actions with separate consultations, and 2) spinning off the Facilities Licenses for future consultation.").)  Thus, while Plaintiff's briefing on this point largely focuses on the exclusion of the Facilities Licenses, the Court still addresses the larger argument regarding whether the Corps improperly segmented the agency action.

alleged unlawful segmentation.[8] (Pl.'s Mot. at 23 (citing C:550:43451).)  Plaintiff does not explain how this graph establishes that the Corps' activities at Englebright and Daguerre are part of the same agency action.  To the extent Plaintiff's argument rests on the fact that both dams are included under a broader header of "Corps' Lower Yuba River Activities," this is unpersuasive.  Every Corps action could be collected under increasingly large geographical headings (e.g., Corps' Yuba River Watershed Activities, Corps' California Activities, Corps' Western United States Activities, etc.).  Activities are not part of the same agency action simply because they occur within an arbitrarily defined geographic area.  Plaintiff does not present any other argument as to why Daguerre and Englebright must be considered part of the same agency action.  Plaintiff has thus not established that the Corps' determination that Englebright and Daguerre were necessarily separate actions, given their independent operation and separate creation, was arbitrary and capricious.

### 2. Facilities Licenses

Plaintiff also claims the Corps' exclusion of the "Facilities Licenses" from the BiOp and LOC also constitutes a violation of its section 7 duties.  The Facility Licenses are licenses and easements given to third parties near the dams.  In particular, Plaintiff takes issue with the exclusion of Narrows 1 and Narrows 2, which are two hydroelectric powerplants at Englebright, as well as the Brophy Diversion and Cordua Diversion located near Daguerre.  Federal Defendants assert these third-party grants were properly excluded as (1) the Narrows powerplants operate under licenses issued by the Federal Energy Regulatory Commission ("FERC") and are thus outside their control and (2) the Corps has not taken any agency action related to the Diversions.

---

[8] This argument is contained within the portion of Plaintiff's claim under the APA regarding the 2013 Englebright BA.  (*See* Pl.'s Mot. at 22–23.)  Nevertheless, given the overlapping nature of these claims and their related arguments, the Court considers that point here.

18

###### i.  The Narrows Powerplants

Plaintiff has not established that the Corps' decision to exclude the Narrows 1 and Narrows 2 powerplants from the agency action was arbitrary and capricious.  The undisputed evidence shows that FERC is the federal agency responsible for section 7 analysis as it relates to the Narrows 1 and 2 powerplants.  Since their creation, both powerplants have existed under licenses granted by FERC or its predecessors.  (*See* C:81:04077; C:17:00285; C:533:42690.)  Over the years, the Corps has entered into separate agreements with the operators of the Narrows powerplants to grant easements and permit usage of the Englebright dam and reservoir.  (*See* C:81:4096–100; C:18:00298–311; C:533:42688–704.)  But these contracts are connected with FERC's licensing of these powerplants and are done pursuant to the licenses granted by FERC.  (*See* C:540:42787–829; *see also* C_ENG:00064.)  FERC is the agency responsible for authorizing, funding, or carrying out the operation of the Narrows powerplants.  The Corps' agreements in connection with those licenses likely warrant some examination as consequences of the grant of those licenses.  *See* 50 C.F.R. § 402.02.  But it is FERC's decision to grant a license that is ultimately the action Plaintiff has identified.[9]  *See* 50 C.F.R. § 402.07; *see also* C_ENG:001762.  The Corps' agreements in connection with that license are ancillary to the FERC license.  As such, Plaintiff has not established that the Corps' decision permit any grants or easements connected to the Narrows powerplants to be analyzed as part of the section 7 analysis requested by FERC for the powerplants' licenses was arbitrary and capricious.

###### ii.  The Diversions

Though largely addressed together by the parties, the Brophy and Cordua diversions are on different factual footing.  Most importantly, Cordua operates under a

---

[9] Plaintiff discussed the outstanding nature of the FERC licenses for Narrows 1 and 2, and raised concerns about the status of contracts between YCWA, the current operator of the powerplants, and the Corps.  (*See* Pl.'s Opp'n & Reply to Fed. Defs. at 9 n.12.)  These concerns may well be valid, and the relicensing is clearly the source of some concern for YCWA as well.  *See YCWA v. NMFS*, 2:25-cv-02511-DJC-JDP.  But this is outside the scope of this litigation.

perpetual license issued in 1911 to the Hallwood Irrigation Company.  (C:178:13644.)  As the Cordua Diversion is otherwise operated by a third party under this perpetual license, Federal Defendants properly determined it did not constitute an agency action as the Corps had not acted to authorize, fund, or carry out the activities associated with the Cordua Diversion.  Plaintiff notes that "[t]he Cordua Diversion's operation is assisted with flashboards placed on Daguerre, as well as by operation of Daguerre's fish ladder gates."  (Pl.'s Mot. at 19.)  But both the flashboards and the fish ladder gates were included in the section 7 analysis found in the 2024 BiOp.  (NMFS_DPD:00945–46; NMFS_DPD:00940–43.)  As Plaintiff has not identified any other activity authorized, funded, or carried out by the Corps in connection with the Cordua Diversion, Plaintiff has failed to identify any agency action improperly excluded from section 7 analysis.

The Brophy Diversion presents more difficult questions.  Unlike the Cordua Diversion, the Brophy Diversion does not operate under a perpetual license.  (C:178:13644.)  For many years, it operated under 5-year licenses granted by the Corps.  (*See e.g.*, C:19:00312.)  The most recent license expired in 2000 and has resided in "hold-over status" since its expiration.  (C:178:13644; C:548:43431–32.)  This historical posture presents a challenge.  As YCWA notes, the Corps has not taken action to issue a license for the Brophy Diversion in over two decades.  (YCWA Mot. & Opp'n at 14.)  Unlike with the Cordua Diversion though, this is not because there is a perpetual license already in place, but because the Corps is presently permitting YCWA to continue under the prior license.  As late as 2013, the Corps expressed an intent to issue a new 5-year license to YCWA for the Brophy Diversion.  (C:548:43431 ("[T]he Corps intends to use YCWA a 5-year licenses for the South Canal diversion facilities to maintain status quo.").)

Further complicating matters is the settlement reached in *South Yuba River Citizens League v. NMFS*, No. 2:06-cv-02845-LKK-JFM (ECF No. 291).  The plaintiffs in that action, the South Yuba River Citizens League and Plaintiff FOR, reached a

settlement with YCWA, which included a provision regarding future actions related to the Brophy Diversion.  In relevant part, that agreement stated the following:

> Plaintiffs also waive any and all rights to bring any future challenge or proceeding against YCWA relating in any way to the Brophy Diversion or against anyone seeking relief relating to the Brophy Diversion, in administrative or legal proceedings, with the exception of a proceeding alleging a breach of this Settlement, unless and until: (1) a new biological opinion is issued by NMFS that covers the Brophy Diversion, in which case Plaintiffs will limit any challenge relating to the Brophy Diversion to whether YCWA has not complied with any requirements under any such biological opinion; or (2) YCWA approves the construction of a new fish screen, in which case Plaintiffs will limit any challenge to whether environmental review for the new fish screen was adequate. Plaintiffs understand, acknowledge, and agree that this Settlement constitutes a complete and sufficient defense barring any such claims included in this paragraph, and that the YCWA can rely upon this Settlement as a complete defense.

*Id.* ¶ 17.  This settlement agreement bars Plaintiff from bringing "any future challenge or proceeding . . . against anyone seeking relief relating to the Brophy Diversion[.]" *Id.* However, the agreement also states that "[e]xcept as provided in this Paragraph 27, this Settlement is not intended to, and shall not be interpreted in a manner so as to confer rights on any person or entity that is not a Settlement Party hereto, or to create intended or expected third party status on any such non-Settlement Party." *Id.* ¶ 27. Thus, Federal Defendants may not invoke this agreement as a bar to Plaintiff's claims. The agreement only empowers YCWA to invoke that agreement to assert Plaintiff's claims are barred.  It has not.[10]  Moreover, in 2016, YCWA and Plaintiff stipulated that

---

[10] YCWA's Cross-Motion does discuss the agreement and the bar, but at no point does YCWA assert that Plaintiff's present claims related to the Brophy Diversion were barred by that agreement.  (YCWA Mot. & Opp'n at 14–15.)  It is also unclear whether Plaintiff's Brophy Diversion claim would be barred even if YCWA had challenged it on this basis as the settlement agreement states "Nothing in this paragraph or agreement, however, shall preclude the Plaintiffs from seeking an order requiring NMFS to issue a new biological opinion that addresses the alleged impacts of the Brophy Diversion that may remain following resolution of the status of Daguerre Point Dam." *South Yuba River Citizens League v. NMFS*, No. 2:06-cv-02845-LKK-JFM (ECF No. 291 ¶ 14).

Plaintiff could pursue claims related to the Brophy diversion.  As such, Plaintiff's claims do not appear barred by the settlement agreement.

The Court finds the Federal Defendants' exclusion of the Brophy Diversion from the section 7 analysis was arbitrary and capricious.  Federal Defendants have failed to adequately explain why the Brophy Diversion was excluded from the 2024 BiOp.  The BiOp identifies that the diversions could present a risk to the Listed Species.  (NMFS_DPD:00990 ("The diversions at DPD present additional risk to CV spring-run Chinook salmon.").)  But without any further explanation, the BiOp considers the Brophy Diversion as part of the environmental baseline.  (NMFS_DPD:00982–83.)  The failure to provide any adequate explanation for the exclusion of the Brophy Diversion from the analysis is sufficient for the Court to find that the BiOp was arbitrary and capricious, as it precludes the Court from undertaking meaningful judicial review.  *FOR*, 786 Fed. Appx. at 669–70.  This issue is deepened by the fact that the Corps is permitting the lease for the Brophy Diversion to remain in holdover status.  In effect, the Corps is engaged in an ongoing determination to permit the Brophy Diversion license to remain in holdover status and may also decide to issue a new license.  Federal Defendants do not meaningfully respond to Plaintiff's arguments, instead resting on the settlement agreement discussed above.  The one substantive argument that Federal Defendants raise as to both diversions is that "the various easements and licenses for the Cordua and Brophy Irrigation Diversions . . . were awarded decades ago, with no continuing action remaining."  (Fed. Defs.' Reply at 6.)  But this ignores the fact that the Corps has permitted the license to exist in holdover status.  Similarly, while Intervenor-Defendant YCWA acknowledges that the Corps has previously issued licenses for the Brophy diversion and may issue licenses in the future, YCWA argues that the Corps has not made any "actual decision" to permit private activity.  (YCWA Mot. & Opp'n at 30.)  But this ignores the fact that the holdover status is itself effectively an ongoing decision.

The 2023 BA issued by the Corps does not acknowledge the license, but identifies that there are future potential agency actions connected to the Brophy Diversion that might require "separate ESA consultation." (C_DPD:000506.) The acknowledgement that the Corps may soon undertake actions related to the Brophy Diversion that would require section 7 analysis highlights the issue with excluding any explanation or analysis as to the exclusion of the Brophy Diversion.[11] In a footnote the Corps also swipes aside that the issuance of a right-of-way to YCWA for the Brophy Diversion as unrelated to Daguerre, without any explanation for how rights-of-way granted by the Corps for a diversion associated with Daguerre is not related to the Corps activities at Daguerre, particularly given the license granted by the Corps to YCWA. (C_DPD:000506 n.17.) While the Court must look to the BiOp, not the BA, to determine if the section 7 obligations have been met, these statements are nonetheless instructive about the reasons the exclusion of the Brophy Diversion is problematic.

Accordingly, Plaintiff's Motion for Summary Judgment is granted exclusively as it relates to the Brophy Diversion. The Court finds that Federal Defendants' failure to explain the exclusion of the Brophy Diversion from the agency action was arbitrary and capricious.

## II.  APA Claims

In his First Claim for Relief, Plaintiff asserts claims against the Corps under the APA, alleging that "[t]he Englebright BA is arbitrary, capricious, an abuse of discretion and not in accordance with the ESA . . . ."[12] (SAC at 29–30.) Plaintiff correctly notes

---

[11] To the extent Federal Defendants believe that the Brophy Diversion may be properly considered by way of separate section 7 consultation, this position appears tenuous at best. The record before the Court shows that the Brophy Diversion has long been considered part of the Corps' activities around Daguerre. It is not readily apparent that Federal Defendants can provide any explanation for considering the Brophy Diversion as separate action that would not invoke serious concerns about impermissible segmentation of the agency action. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 523 (9th Cir. 2010).

[12] Plaintiff also asserts APA claims against NMFS based on the issuance of the 2014 LOC, as supplemented in 2022, as well as the 2024 BiOp. (SAC at 30-33 (Second and Third Claim for Relief).) These claims appear to overlap in their entirety with Plaintiff's section 7 claims. Likely for this reason,

that while they addressed their section 7 and APA claims separately, "the[ir] fundamental legal argument that the Corps's Englebright decision is unlawful [under the APA] and the Corps is liable for violating ESA section 7 is the same." (Pl.'s Mot. at 12.)  The legal analysis is also fundamentally the same in most ways; ESA claims, like those above, are reviewed "under the standards of the APA." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601.  Thus, both claims are reviewed to determine if the challenged action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  The one major distinction is that adjudication of APA claims is strictly limited to the administrative record, while ESA claims may permit courts to consider extra-record evidence in ruling on summary judgment.  (*See* ECF No. 169.)

In reaching the determination above as to Plaintiff's section 7 claims, the Court has necessarily resolved the vast majority of this claim.[13]  For the same reasons stated above and with the benefit of the further explanation provided by Federal Defendants, the Corps' determination that it did not have discretion over Englebright, its decision to separate Englebright and Daguerre, and its exclusion of the Narrows 1 and 2 licenses, were not arbitrary and capricious.

Plaintiff also argues that the exclusion of the Corps' LWM placement program and gravel augmentation from the Englebright BA was a violation of the APA.  As best the Court can discern, the exclusion of these actions is a product of the Corps' decision to separate the analysis of Englebright and Daguerre.  When the 2013 BAs for Daguerre and Englebright were prepared, the gravel augmentation and LWM

---

Plaintiff does not separately move for summary judgment as to these claims.  The Court considers these claims resolved by the Court's decision above regarding Plaintiff's procedural section 7 claims.

[13] Federal Defendants also contend that the 2013 Englebright BA is not appropriately a "final agency action" for purposes of the APA and thus not subject to review. (Fed. Defs.' Mot. & Opp'n at 10 n.9.) During the prior summary judgment proceedings, Judge Mendez determined that review of the BA as a final agency action reviewable under the APA. (*See* ECF No. 62 at 18.)  The subsequent proceedings have not meaningfully changed the basis that underlay Judge Mendez's determination.  As such, the Court will continue to consider the 2013 Englebright BA to be a final agency action, reviewable under the APA based on that prior finding.

program were included in the Daguerre BA as a Corps action taken as part of their voluntary conservation program. C:81:04116–17. These actions were later analyzed in the 2014 Daguerre BiOp. NMFS_0000313-15. The gravel augmentation and LWM program were again included as agency action in the 2023 BA and 2024 BiOp for Daguerre. (C_DPD:00529–32; NMFS_DPD:00950-52.) Plaintiff has not adequately explained why the decision to associate and analyze the gravel augmentation and LWM program in connection with Daguerre, as opposed to Englebright, violates the APA. Plaintiff's Motion asserts that "[t]he Corps unlawfully excluded those programs in its BA list of Englebright discretionary activities to avoid conflict with the Corps's position that it lacks discretion to take any actions at Englebright to benefit the Listed Species." (Pl.'s Mot. at 25.) But that argument is illogical given the Corps' decision to include these programs in the 2013 and 2023 BAs for Daguerre, a dam they also assert they lack the discretion to remove or modify. In reality, it appears that in separating activities around Daguerre and Englebright, the Corps made a determination that the gravel augmentation and LWM program was most closely associated with Daguerre, not Englebright. Plaintiff has not presented evidence to establish that this decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). Accordingly, Defendants are entitled to summary judgment on this claim.

**III. Substantive Violation of ESA Section 7**

Plaintiff contends that the Corps also violated its substantive section 7 obligations. Plaintiff's initial argument in this regard – that the Corps violated the substantive obligations as the 2024 BiOp and 2014 LOC (with the 2022 supplemental LOC) are flawed based on the improper definition of the agency action – fails based on the Court's determination above that the agency action was properly defined. Plaintiff secondarily argues that the Corps has engaged in conduct which jeopardizes the Listed Species' survival and recovery based on their alleged failure to comply with

25

the Reasonable and Prudent Alternatives ("RPA") in the 2024 BiOp.[14]  (Opp'n at 21–22.)

In their briefing, the parties debated whether Plaintiff's claim is that Federal Defendants violated their duties by failing to comply with the terms of the RPA in the 2024 BiOp (*see* Fed. Defs.' Mot. & Opp'n at 22), or by jeopardizing the Listed Species' survival "[b]ecause the Corps has failed to comply with the 2024 BiOp RPA," (Pl.'s Mot. at 22).  Ultimately, this distinction is irrelevant in this case.  Though Plaintiff's claim is clearly the latter – that the Corps is jeopardizing the Listed Species' survival – Plaintiff's sole basis for this argument is that the Corps has failed to implement the 2024 BiOp RPA and Terms and Conditions.  (*Id.* at 21.)  The record simply does not presently support that the Corps is not implementing any RPA or its Terms and Conditions.

In support of their argument, Plaintiff points to the Corps' disagreement with Term and Condition 2, Term and Condition 1.b, and RPA 5.  (*Id.*)  Certainly, the evidence shows that there the Corps disagrees that Term and Condition 2, which requires the gate to the Hallwood-Cordua diversion to be repaired, Term and Condition 1.b, which requires that the Corps install a gauge or conduct monitoring to record flow stage levels, and RPA 5, requiring Daguerre to begin the process for inclusion in the National Dam Inventory, are appropriate.  (C_DPD:00120–21.)  But the Corps' disagreement with these Terms and Conditions and RPA 5 does not establish that the Corps has not, or intends to not, implement them.  In fact, in raising these disagreements, the Corps plainly stated that "[n]otwithstanding the District's concerns regarding NMFS' jeopardy and adverse modification conclusions, the District intends to implement the RPA where it has authority to do so."  (C_DPD:00116.)

Beyond the Corps' stated disagreement, Plaintiff's only evidence supporting their assertion that the Corps is not implementing the above is that the Corps' annual

---

[14] Federal Defendants dispute that this claim was properly raised and argue that Plaintiff failed to provide the statutorily required notice of this claim.  The Court does not render any decision on these issues, as the discussion below is dispositive of Plaintiff's claims regardless of whether these claims were properly raised.

report does not document the Corps' implementation of Term and Condition 2 and 1.b or RPA 5. (Pl.'s Mot. at 21.) Plaintiff asserts that "2024 BiOp requires the Court to report on its T&C implementation and information it gathers in the process." (*Id.*) But while the BiOp does state that "[the Corps] shall, by January 31 of each year, report to NMFS an update on the previous year's implementation of all aspects described in this opinion." (NMFS_DPD:001060.) The BiOp expressly states that the minimum requirements for the information contained in that report are:

> i. The timing (dates), cause, and solution of any fish passage impediments that lasted greater than 24 hours, including summaries of communications with NMFS regarding such impediments.
>
> ii. The size, quantity, and timing of the previous year's gravel augmentation, including any updates on funding requests.
>
> iii. The size, quantity, timing, and location of the previous year's LWM program, including any updates on funding requests.

*Id.* Plaintiff does not assert that the Corps has failed to comply with any of these requirements. As Federal Defendants' note, the BiOp also does not impose a timeline for implementation of any of the terms Plaintiff identifies. The lack of discussion of the implementation of the specific Terms and Conditions does not establish that the Corps intends to not implement them.

Plaintiff does not point to any other evidence in the record that the Federal Defendants are not implementing the RPA or its Terms and Conditions. As such, Federal Defendants' Motion for Summary Judgment shall be granted as to Petitioner's claim that the Corps is violating its substantive section 7 duty by failing to implement the 2024 BiOp RPA.

## IV. ESA Section 9 Take Claim

Plaintiff has seemingly abandoned their section 9 take claim. (*See* Pl.'s Mot. (not seeking summary judgment as to Plaintiff's take claim); *see also* Pl.'s Opp'n &

27

Reply to Fed. Defs. (not opposing or addressing Federal Defendants' Motion for Summary Judgment as to Plaintiff's take claim).)  For the reasons discussed above, the existence of Daguerre and Englebright are not an agency action attributable to the Corps.  The Corps has received an incidental take statement for the Corps' actions at Daguerre, and there is no indication that the Corps has exceeded the take authorized in the Incidental Take Statement.  (*See* NMFS_DPD:01054–61.)  As Plaintiff has abandoned this claim, Plaintiff has not established that the Corps has engaged in an unauthorized take of the Listed Species.  As such, summary judgment shall be granted in Defendants' favor as to Plaintiff's section 9 take claim.[15]

### INTERVENOR-DEFENDANT'S MOTION TO AMEND

Intervenor-Defendant YCWA has belatedly sought to leave to file an amended answer to assert crossclaims against NMFS that YCWA has raised in a related action.  (ECF No. 202.)  The Court issued a scheduling order in this matter on February 7, 2025.  (ECF No. 157.)  In that order, the Court ordered that there was to be "no further joinder of parties or amendments to pleadings . . . without leave of the Court, good cause having been shown." (*Id.* at 1.)  As such, YCWA may only amend its answer "only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4); *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).

On September 2, 2025, YCWA filed a separate action against NMFS based on the 2024 BiOp that was partially at issue in this action.  *See YCWA v. NMFS*, 2:25-cv-02511-DJC-JDP.  On December 11, 2025, after the completion of extensive briefing on the Cross-Motions for Summary Judgment which were pending before the Court, YCWA filed a motion to amend its answer to essentially add the claims raised in the other action as cross-claims in this action.

---

[15] Plaintiff's Section 9 claim did not include claims that the Corps was engaged in an unauthorized take of the Listed Species through the agency action connected to the Brophy Diversion.  (*See* SAC ¶¶ 112–20.)

YCWA has not established good cause to amend the scheduling order to permit YCWA to amend its answer to assert new cross-claims. The BiOp at issue had existed for over a year prior to YCWA seeking to amend. Despite this, YCWA waited until after summary judgment briefing was complete and pending before the Court before it elected to seek amendment. Where a party has not acted diligently, the good cause inquiry comes to an end. *Johnson*, 975 F.2d at 609. YCWA has not acted diligently in seeking to amend its answer. YCWA explains that "YCWA was still in the process of evaluating its claims, exhausting its administrative remedies, and pursuing an out-of-court resolution with Federal Defendants." (ECF No. 205.) But while the need to administratively exhaust claims might excuse some delay, it does not provide an excuse for the extensive delay in bringing this motion.

Accordingly, Intervenor-Defendant YCWA's Motion to Amend its Answer (ECF No. 202) is denied for failure to establish good cause.

## CONCLUSION

In accordance with the above, IT IS HEREBY ORDERED that:

1. Federal Defendants' Motion for Summary Judgment (ECF No. 172) and Intervenor Defendant YCWA's Motion for Summary Judgment (ECF No. 175) are GRANTED IN PART except as it relates to the Brophy Diversion for which these Motions are DENIED IN PART.

2. Plaintiff's Motion for Summary Judgment (ECF No. 166) is GRANTED IN PART as to the exclusion of the Brophy Diversion from the agency action considered in the 2024 Biological Assessment and DENIED IN PART as to the remainder of the Motion.

3. This matter is remanded to the National Marine Fisheries Service to reassess the 2024 Biological Opinion in light of this Order. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

4. Within thirty (30) days of this order, the Parties shall meet and confer to propose a schedule to complete the remand.

5. Intervenor-Defendant YCWA's Motion for Leave to Amend its Answer (ECF No. 202) is DENIED.

6. The Clerk of the Court is directed to enter judgment.  The Court will retain jurisdiction to oversee Defendants' compliance with this Order during the remand period.

Dated:  March 31, 2026

/s/ Daniel J. Calabretta

THE HONORABLE DANIEL J. CALABRETTA
UNITED STATES DISTRICT JUDGE